[Sac. No. 951. In Bank.—December 19, 1903.]

ELIZA M. E. HARTLEY, Respondent, v. FRANK M. VERMILLION, and FRANK H. BUCK, Appellants.

PUBLIC HIGHWAY—OBSTRUCTION—INJUNCTION.—Where it appears that a road claimed by the defendants as a private road was laid out or designated by the parties through or across whose land it ran first, and has since been used by all persons who had occasion to pass that way, and became dedicated or abandoned to the public prior to the placing of an obstruction thereon by the defendants, this constituted it a highway, or public road, within the terms of the statute as well as at common law, and the defendants were

properly enjoined from obstructing or interfering therewith, to the injury of the plaintiff.

ID.—"PRIVATE" AND "PUBLIC" ROADS—POWER OF LEGISLATURE—CLASSIFICATION OF HIGHWAYS.—The legislature has no power to lay out "private" roads so as to make them the property of individuals or private ways at common law; but a road laid out as a "private road" becomes a public way, over which all may lawfully pass who have occasion. The distinction between "public" and "private" roads is one merely of classification of highways.

ID.—PRESCRIPTIVE USE OF ROAD—IMPLIED DEDICATION.—Where, as in this case, the public, or such portion of the public as had occasion to use the road, traveled over the same without asking or receiving any permission, and without objection from any one, for the period of time beyond that required by law to bar a right of action, a right in the public to the use of the road arises by prescription or implied dedication.

ID.—ESTOPPEL OF DEFENDANT.—Where one of the defendants sold to the plaintiff a strip of land along his north line for the purpose of a right of way from the plaintiff's premises to the road in question, as a means of reaching a public highway, such defendant is estopped from denying as against the plaintiff that there was a dedication of the road in question.

APPEAL from a judgment of the Superior Court of Solano County and from an order denying a new trial. A. J. Buckles, Judge.

The facts are stated in the opinion of the court.

Raleigh Barcar, and O. R. Coghlan, for Appellants.

M. A. Wheaton, I. M. Kalloch, and George A. Lamont, for Respondent.

VAN DYKE, J.—This action was brought to declare a strip of land running north a mile and a quarter to a mile and a half from the county road in Solano County, commonly called the E. R. Thurber road, to the south line of defendant Vermillion's so-called home place, a public highway, and to restrain defendants from obstructing the same. The answer denied that the so-called road or highway was a public road or highway, but averred that the same was a private road, the property of the defendants, in which the general public had no interest whatever. The court found in favor of the plaintiff, and entered judgment accordingly, and enjoined the de-

fendants from obstructing or interfering with the said public road; from which judgment and the order denying defendants' motion for a new trial the defendants appeal. The main point on the appeal is the contention on the part of the defendants that the evidence does not sustain the finding of the court that the road in question is a public road and highway.

The following is a summary of the evidence on the part of the plaintiff: William Lockie testified in substance that he had known the. road in dispute eight or ten years, and has used it and seen others use it. He used it off and on for about ten years prior to 1898, and has been in the habit of traveling over the same since, and while traveling over the road no one ever objected. "I never asked permission of Mr. Vermillion or Mr. Buck, or any one else, to travel that road." James Lockie, another witness for plaintiff, testified that he had known the road in dispute for eight years and had used it for about five years. "When I traveled the road in dispute I never asked permission of any one. I did n't know I had to. . . . While traveling it I could see no difference between it and other roads which had been known to be county roads, but it was not quite as wide as others." E. A. Peabody, another witness for plaintiff, testified that he traveled the road, and that no objection was made to his doing so at any time. and he asked no one's permission to travel it. It was open, and people seemed to be going and coming, and he supposed it to be all right. Michael Farrell, also for the plaintiff, testified he had known the disputed road for about twenty years; had been over it, he thought, before any of the land belonged to Mr. Buck (defendant). "When I traveled the road no one objected to it, nor did I ever ask any one's permission to travel it. It was not necessary, as it appeared to me." R. E. Burton, also for the plaintiff, testified that he had been perfectly familiar with the road for about twenty-two years, and had used it whenever he wanted to. "I have never asked any one's permission to use the road this side of Mr. Vermillion's. I never asked any one's permission to travel the road between Mr. Vermillion's upper place and the E. R. Thurber road, and no one ever made an objection to my traveling it. I never asked any one's permission to travel over the disputed road prior to 1898. I did not ask permission, because those people

traveled it, and we were doing just the same as other people
were doing." James Burton testified similarly. I. K. Buck,
also a witness for the plaintiff, testified he had been familiar
with the disputed road about fifteen years, and resided on it,
the second house from the E. R. Thurber road. It passes over
his (the witness's) land. From the so-called Thurber road
up to Vermillion's home place he thinks it is a mile and a half.
He says: "No one ever objected to my traveling over any part
of the disputed road, and I never asked permission to use any
portion of it." William H. Buck, also for the plaintiff, testi-
fied that he was familiar with the disputed road, and had been
for something like eighteen years. He had used it as far as
his place all that time. His place is on the disputed road,
which runs across one end of his land about eighty rods. He
says: "I never, in the use of this road, asked or received per-
mission from any one to travel it, or any part of it. So far as
it passes over my land, I never gave any one permission to
pass over it. I never objected to any one going over, and do
not recollect that any one ever asked my permission. I had
no other way out to the Thurber road only this road." W.
W. Smith, also for the plaintiff, testified that he is a resident
of Vacaville, and had known the disputed road since 1859,
traveling over it in the spring and summer of that year. "I
never asked any one's permission to travel it." On cross-
examination he admits that he got defendant Vermillion's per-
mission to cross his upper place, but says he did not get any
one's permission to travel the disputed road, which did not
pass into or over that upper Vermillion place at all. It com-
menced at the south line of Vermillion's upper place and ran
south to the so-called Thurber road, which is admitted to be
one of the public highways of that county. He says he never
knew of the public being prohibited from traveling that road
until last summer, when the defendants put a gate across it to
stop Hartley from traveling it. D. J. Parmelee, another wit-
ness for the plaintiff, testified that he lived some distance
north of the north end of the disputed road, and has known
the said road for about nineteen years, and has traveled the
same. "I never asked permission to travel over the disputed
road before last summer. That was the time when the gate
was put across it as already stated." Ralph H. Platt, for the

plaintiff, testified that he resided in Vacaville, and had traveled the road since May 1, 1874. ''I never asked anybody's permission to travel over it. I did not think it was necessary. I thought it was a public road up until a little while ago, a little before last August, as I remember it, and there was never any objection made by any one to my traveling it.'' C. M. Hartley testified that he had been the agent for his mother, the plaintiff, and had traveled the disputed road for some fourteen years without any objection from any one, or without asking any one's permission. The ranch, or place, of the plaintiff of which the witness acted as agent is to the east of defendant Vermillion's upper or home place, and prior to 1895 he had been accustomed to pass through the defendant Vermillion's upper place, and thence down to the road in dispute. In December, 1895, he was served with a notice by Vermillion thereafter not to pass over said land. The notice says: ''The land referred to is situate in Vaca Township, Solano County, California, and is bounded on the north by land of Hatch, and on the east by land of Hartley, on the south by land of F. H. Buck, and on the west by land of F. B. McKevitt and land of F. H. Buck, and known as the Vermillion ranch or farm.'' This tract does not include any of the disputed road, but lies to the north of it. This witness also produced an agreement entered into between the plaintiff and the defendant Buck for the sale of a strip of land on the northerly line of defendant Buck's tract above referred to, for a right of way out to the disputed road to the south of the defendant Vermillion's gate, and south of the defendant Vermillion's tract described in the notice above. Part of the consideration of this strip for a right of way was the sale by plaintiff to Buck of about forty acres of land joining Buck's tract at a reduced price. In the deed conveying the strip in question the description runs along the north boundary-line of the said Buck ''to the center of a road used by said Buck and others,'' being the road in dispute, and in the agreement Buck agrees ''to pay one half of the cost of bridges along the above-described right of way, and to fence the said right of way on the north side its entire length at his own cost and expense.'' There was quite a deep creek running southerly east of the road in dispute and between it and the Hartley tract, which it was necessary to

bridge in order to make the strip purchased available as a means of reaching the road in dispute, which bridge cost between two hundred and fifty and three hundred dollars. He further testified that on the east side of the disputed road was a large gate-post which had been standing there for the past ten or twelve years, and that it had been used as a corner-post for the fences. The fence running along the north side of the Thurber road is nailed to it, and the fence on the east side of the disputed road is also nailed to it; and on the west side of the road is also an old gate-post used in a similar manner. These two gate-posts at the entrance to the road in dispute are corner-posts of fences, and are about thirty feet apart, and never interfere with the travel on the disputed road. He says: "I never asked Mr. Buck's or anybody's permission to travel the disputed road at any time whatever; never conversed with anybody with reference to asking permission to travel that road during the whole period of fourteen years over which I have traveled it. I always claimed the right to travel the disputed road the entire fourteen years that I traveled it. I paid about eighteen dollars towards fixing the roadway now in dispute. Before the shaling was done, I rode over the properties of W. H. Buck and I. K. Buck." Defendant Buck, in the fall of 1893, spoke to him of his desires of shaling the road along William Buck's and I. K. Buck's, and asked how much he thought he ought to contribute. "And the upshot of it was I gave him eighteen dollars to assist in putting shale on that bad place." This was not as a consideration for traveling the road, but simply to aid in putting it in repair. "I felt that whenever I traveled that road nobody could stop me." Nothing transpired to the contrary until defendant Buck objected to his hauling, along just before the commencement of the suit in 1899, on account of the dust that his hauling created. The plaintiff testified that the preceding witness, Clement Hartley, was her son, and acted under her authority in the premises, and that he had been her agent attending to her business during the last fourteen or fifteen years. "I never asked permission of Mr. Buck or Mr. Vermillion, or any one else, for myself, or my teams, or my employees, to travel the disputed road. Objection to my teams or employees and agents in traveling

the disputed road was never made to me." She testified: "I would never have made the deed with Mr. Buck conveying him that land for the price I did, and accepted the conveyance of the right of way as part of the consideration, if I had not believed that by getting this right of way I was getting a free, open road all the way to Vacaville from my place." On the part of the defendants, D. K. Corn testified that he had been a supervisor of Solano County for eight years from 1884, and says: "So far as I know, that road has always been traveled by the public generally. I have never known permission being given by the owners of the land over which the road runs to any one. I never asked permission." Also, for the defendants, E. N. Eager, who had been county surveyor of that county, testified that he knew the road, and while making a county map he put the disputed road on the map as a private road. Defendant Buck, who claims the road in question to be a private road, could name but one person, M. R. Miller, whom he stopped from traveling that road prior to the obstruction of the plaintiff, and that was about fourteen years before the trouble with the plaintiff. L. L. Hatch, for the defendants, stated that the line of travel from the county road to his ranch is up through past Mr. Pinkham's, I. K. Buck's, L. W. Buck's, Frank Buck's, through Mr. Chubb's, and then through Mr. Frank Buck's upper place, and through Mr. Vermillion's place; has known the road for twenty-five years. "It has been traveled by teams during all that time, by people who lived there, and by others." He says he did not consider it a public road because it was not a county road; it was not kept up by the county. He says: "I never asked permission of any one to travel the disputed road at all. I suppose so far as Mr. Buck's house it looks pretty near as a public road; looked the same as a public road to me. It has been worked generally by the parties that lived on it." The defendant Vermillion says: "The character of the use of the road, so far as I have known it, from the E. R. Thurber road north, has been, the people that lived along it used it principally. Mr. Buck has a great many hands and wagons, and I suppose as far as Mr. Buck's house it there, and gets off a great deal of fruit—great many vehicles looks pretty near as a public road—looked the same as a

public road to me. It has been worked generally by parties that lived on it, parties owning property adjacent to it.'' He was asked on cross-examination whether he ever stopped any 'one from passing over the disputed road, and answered: "No; I don't think so myself, unless they passed through my place. —Q. Now, I will ask you again, is it a fact or not, that every one that desired to make an effort to pass over this disputed road between the Thurber road and the gate at your upper place passed over it without asking permission of any one to do so?—A. Well, I can't call to mind any time that any one was barred out from down there particularly.'' William Rippey, for the defendant, never heard the road called a public road. F. H. Buckingham, also for the defendant, testified that he was at that time one of the supervisors of the county and road commissioner, and knows the road running across the valley referred to as the Thurber road. He also says he knows the disputed road as far as Mr. Buck's north line, and as far as Mr. Vermillion's south line; no further than that. He says it has always been considered a private road. On cross-examination he explains why he considered it a private road; that it had been a matter of investigation by the board of supervisors, and had not been adopted as a county road. On cross-examination he admits that those who called it a private road included the entire road, beginning at the Thurber road and running through Vermillion's upper place to Pleasant Valley. John Caughy testified that he had charge of defendant Buck's place, and said that Buck paid about two thirds of the expense of keeping the road in dispute in repair, and that it cost from one hundred and fifty to two hundred dollars a year. Defendant Buck testified that he is one of the owners of the land over which the road passes; that he has traveled the road about fifteen years without asking permission from any of the other landowners, and the only one that he can recollect of ever having given permission to pass through his place was Mr. Zimmerman, which was quite recently. He says: "I think Mr. Hartley sold me the land a little cheaper than if he had not obtained this right of way.'' He was asked on cross-examination: "Would the right of way which you conveyed to the Hartleys have been of any advantage or benefit to them unless they could continue on down over this

disputed road to the Thurber road?—A. Probably not, probably not.—Q. You knew all those years that everybody was traveling that road that had occasion to travel it, did you not?—A. Yes.''

It is contended by defendants' counsel, correctly, that the conveyance of the right of way by defendant Buck through his land to the road in question would not bind the defendant Vermillion; but it must be remembered also that defendant Vermillion did not own a foot of land over which the road passes from his upper place to a point very nearly to the Thurber road, a distance of about a mile. · He purchased a narrow strip along the Thurber road on the east side of the road in dispute, as he says, to insure his right of way through to the Thurber or public county road. The evidence shows that the so-called disputed road was laid out or designated by the parties through or across whose land it ran first, and has since been used not only by them but by all others who had occasion to pass that way, and became "dedicated or abandoned to the public" prior to the obstruction placed therein by the defendants in 1899. This constituted it a highway or public road within the terms of the statute, as well as at common law. "In all counties of this state public highways are roads, streets, alleys, lanes, courts, places, trails, and bridges, laid out or erected as such by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such in actions for the partition of real property.'' (Pol. Code, sec. 2618.) In *Sherman* v. *Buick*, 32 Cal. 241,[1] the subject of public and private roads is discussed in the opinion of the court by Justice Sanderson at considerable length, in which he takes occasion to criticise the terminology in certain acts of the legislature on the subject. It is said: ''If the legislature provides for the laying out and establishing of a certain class of roads or highways which from any cause, whether for the purposes of classification, or otherwise, is denominated 'private,' or as being for the especial benefit of certain individuals upon whom the burden of cost and repair is cast, instead of the public at large, it by no means follows that such roads become the private property or estate of the individuals designated, . . . for where roads are laid out,

[1] 91 Am. Dec. 577.

whether mainly for the accommodation of particular neighborhoods or individuals or not, it must be understood as having been provided for the use of every one who may have occasion to travel it, and hence as being public. In other words, the legislature has no power to lay out and establish private roads in the sense that they are to be the private property of particular individuals, or that they are what are denominated 'private ways' at common law; and hence, so far as they undertake to do so, their action is simply null and void; but the road so laid out and established becomes a way over which all may lawfully pass who have occasion, and therefore public; and the language employed by the legislature, so far as it relates to the legal character of the road—as public or private—must be understood as being used for the purpose of distinguishing it from all other roads, or, in general terms, for the purposes of classification. In accurate legal contemplation the term 'private road' involves a contradiction. The term is unknown to the common law. It has its origin in American legislation. It cannot be regarded as having been employed as a substitute for the word 'way,' as used at common law. . . . For the purpose of distinguishing between such roads and those which subserve equally the interests of all, a name for the former was needed, for the legal term 'highway' was alike applicable to both; hence the terms 'public' and 'private' roads. The latter is not to be understood as being synonymous with 'ways' at common law, but as indicating a particular class of highways or public ways over which any one may pass without committing trespass.''

It is a matter of common knowledge that many roads and highways in this state—starting, perhaps, first as mere trails —became public highways without any formal or express dedication, but by long uninterrupted use and general acquiescence. When, as in this case, the public, or such portion of the public as had occasion to use the road, traveled over the same, with full knowledge of the landowners interested, without asking or receiving any permission and without objection from any one, for a period of time beyond that required by law to bar a right of action, a right in the public to the use of the road arises by prescription or implied dedication. (*Schwerdtle* v. *County of*

*Placer,* 108 Cal. 589.) In the opinion in that case a large number of authorities are cited to the effect that a dedication is presumed from long and continued adverse use as a road or highway. In this connection it may be remarked that as to the defendant Buck, he is estopped from denying that there was a dedication of the road in question. In *Stone* v. *Brooks,* 35 Cal. 490, lots were sold as abutting on or extending to Perry Street, "which at that time, so far as actually opened, was but a *cul de sac,*" and it was held as a dedication by the seller of the portion of the lot represented as an extension of Perry Street. In the opinion many cases are cited to the same effect. The evidence is clear that Buck sold the strip of land to the plaintiff along his north line for the purpose of a right of way from plaintiff's premises to the road in question as a means of reaching a public highway.

*Cooper* v. *Monterey County,* 104 Cal. 438, relied upon by appellants, is altogether different from the case at bar. There it was said the language of the finding did not negative the idea that the use might have been under a mere license. Here the finding is, that for more than ten years last past there has existed, and now continues to exist, a public road and highway in Vaca Valley, from the public road known as the E. R. Thurber road to the land of defendant Vermillion, and that for more than ten years last past before the commencement of this suit the plaintiff has, with the general public, used the said road and highway as a public road and highway, without let or hindrance of any kind, until the erection by the defendant of the gate upon the third of August, 1899. These findings expressly negative the presumption that the use of the road was by license or permission, but, on the contrary, as a matter of right and without permission of any one, and we think the findings of the court are abundantly sustained by the evidence.

The judgment and order are affirmed.

Shaw, J., McFarland, J., Lorigan, J., Beatty, C. J., and Henshaw, J., concurred.