LILLIS v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1911.)

No. 1,715.

1. CRIMINAL LAW (§§ 370, 371*)—EVIDENCE—OTHER OFFENSES—KNOWLEDGE—INTENT.

Where, in a prosecution for maintaining an unlawful inclosure of, and hindering free passage on, public lands, defendant testified and sought to show that the fence had been constructed only to prevent cattle from straying back to the place from which they had been brought, and that he had instructed his workmen to construct gates over every trail, and not to impede others from using the government land, so that it was material to show whether the fence was constructed with a lawful or unlawful intent, evidence that defendant and his foreman had procured settlers to homestead certain tracts of government land within the inclosure, had defrayed their expenses in filing and making proofs at the land office, and, in some instances, had paid the settlers a consideration beyond such expense and in others had built cabins for the settlers to live in, and inferentially had agreements with such homesteaders whereby he would ultimately obtain title to the land, was admissible to show defendant's knowledge that there was public land within the inclosure, and to show the intent with which the fence was maintained, though tending to show the commission of another offense.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 825–832; Dec. Dig. §§ 370, 371.*

Evidence in criminal prosecutions of other acts and offenses to show knowledge, see note to Lobosco v. United States, 106 C. C. A. 479.]

2. Public Lands (§ 21*)—Offenses—Inclosure—Indictment—"Or."

An indictment for inclosing public lands, alleging that accused so constructed. maintained, and controlled the inclosure then and there having no claim or color of title made or acquired in good faith or otherwise or at all to any of the land, "or an asserted right" thereto by or under claim made in good faith, with a view to entry thereof, etc., was not fatally defective for failure to sufficiently negative the asserted right by a direct and positive averment, since the word "or," both in the statute and in the indictment, should be construed to mean "nor."

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 21.*

For other definitions, see Words and Phrases, vol. 6, pp. 5002–5015; vol. 8, p. 7739.]

In Error to the District Court of the United States for the Northern Division of the Southern District of California.

S. C. Lillis was convicted of maintaining an unlawful inclosure of, and hindering free passage upon, public lands, and he brings error. Affirmed.

H. H. Welsh, E. O. Miller, Sutherland & Barbour, and P. F. Dunne, for plaintiff in error.

Oscar Lawler, Asst. Atty. Gen., A. I. McCormick, U. S. Atty., and Frank Stewart, Asst. U. S. Atty., for the United States.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is a writ of error from a judgment of conviction upon the charge of maintaining an unlawful inclosure of, and hindering and impeding free passage upon, public lands. The record contains 100 assignments of error, but in the arguments of counsel and the presentation of the cause here in reality but two are relied upon for reversal. These pertain, first, to the admission of certain evidence over objection; and, second, to the sufficiency of the indictment, which was challenged for the first time by motion in arrest of judgment. The indictment was returned November 5, 1906.

[1] Evidence was introduced tending to show that beginning with the early part of 1901 and embracing a period of about two years the defendant constructed a fence of posts and wires, commencing at the southwest corner of township 15 S. range 13 E., and running thence east 5½ miles, thence meandering practically about the section boundaries, in a southeasterly direction, to the southwest corner of township 16 S., range 15 E., thence south three miles, thence southeasterly, meandering the section boundaries, to the southwest corner of section 27, township 17 S., range 15 E., thence south 3½ miles, thence west 2 miles, thence in a southwesterly direction, meandering the quarter section boundaries, to the southeast corner of section 24, township 18 S., range 14 E., thence west 1½ miles, and thence south to termination; also another line of fence beginning at the southeast corner of section 33, township 18 S., range 14 E., and running thence west about 5½ miles, thence northwesterly ½ mile to termination near the center of section 34, township 18 S., range 13 E., Mount Diablo

base and meridian, state of California, both stretches covering a distance of from 40 to 45 miles; that thereafter Lillis maintained said fences down to the time of the finding of the indictment; that such fencing, conjoined with natural barriers extending a short distance on the south and for 18 miles or more on the west, constituted an inclosure which comprised within its boundaries approximately 32,760 acres of the public lands, the property of the general government, and that said fences prevented and obstructed free passage and transit to and from the said public lands. In connection with these proofs, and as part of the government's case, the government was permitted, over the objection of the defendant, to introduce evidence tending to show that the defendant by himself and through his foreman—principally through the latter—procured pretended settlers to homestead certain tracts of the government land situated within the boundaries of the supposed inclosure; that defendant defrayed the expenses of the settlers in filing and making the requisite proofs at the land office, and in some instances paid the settler something beyond these expenses; that in some cases he built cabins for the claimants to live in, and inferentially that he had entered into agreements with the homesteaders whereby he was to obtain the title to the claims eventually after patents had issued; that in other cases he arranged to pay the expenses of homesteaders for commutation and cash purchase from the government, and, again, that he acquired other tracts of the public lands lying within the confines of said inclosure by the use of certain lieu land scrip, thus indicating a purpose on his part of acquiring from the government, either directly or indirectly, much of the public lands under the cover of this alleged inclosure. Further evidence was admitted to the effect that the accused had signified to his foreman that he desired to procure certain of such lands, and instructed such foreman to keep him advised and to assist him in that purpose.

The specific and strenuous objection to this testimony is that it, or such part as relates to the homestead entries, tends to establish the guilt of the defendant of a wholly different and distinct offense from that for which he is on trial, and, further, that it is entirely irrelevant and beside the issues of the case, having no tendency whatever to support any ingredient of the crime of unlawfully inclosing or impeding free access to the public lands. In this relation it is urged that intent is not an element of the offense, nor necessary to be shown in order to make out the charge.

On the other hand, counsel for the government insist that the testimony complained of is pertinent and relevant for two reasons: First, as tending to show knowledge on the part of the accused that public lands were situated within the inclosure, or in such relation to the fencing that free access thereto would be impeded; and, second, as tending to show with what intent and purpose he maintained the fencing.

It must be predicated of the defense that the effort was to show that the purpose on the part of the defendant in maintaining the fences was not to inclose any lands whatever, but as a barrier only to keep his stock from ranging back to the locality from which they were driven, or to certain swamps, and from trespassing upon the lands of

private owners living to the east and south of defendant's holdings. The premise is abundantly supported by the testimony of Mr. Lillis. He says:

"I use that land for cattle grazing, horses. I have not always had stock on the land since I owned it. I have had and now have stock upon the land. * * * When I put the cattle on the land in the fall of 1901, I had very great trouble about keeping them on my ranch. When you move cattle to a new place, they want to go back home; and another cause in that region was on account of the dry condition of the country, and the atmosphere. When they got out a little ways, they would get thirsty. They would get very thirsty and leave. The cattle always wanted to go in the direction from which they were brought. For instance, if you brought them from the south, they wanted to go south; if you bring them from the east, they want to go east. These cattle principally went southeast, out by Mr. McCord's, and by Mr. Ladd's and went to the swamp, on what was known as the 'grant.' They would go out in numbers, small groups, from 5 to 100, sometimes, go together, though cattle usually in drifting off that way go in small numbers, as though they were acquainted with each other. This fence that has been referred to in evidence here and shown upon the map I constructed or caused to be constructed. I first began making preparations for the fence some time before those cattle reached the ranch. There was part of the fence built in 1901, and finished in 1902. I completed that fence in the fall of 1902. The reason and purpose of building that fence was to keep my cattle from running away from the ranch, going to the swamps, and also, in the eastern portion of it, to prevent them getting on any grain planted on the outside. * * * I gave the foremen or the men who constructed that fence instructions to put in a gate at every trail and every road, wherever they crossed it, and, so far as I could ascertain, they did put in a gate at every trail or opening. I made an examination of it after the construction of the fence and found the gates there. At that time I did not give them any other instructions to leave any openings at any other places except the trails and roads, but I did shortly thereafter. * * * I gave instructions to my foremen not to molest anybody on government land, sheep, cattle, horses, men, or anything else. I never gave any instructions to my foremen not to allow cattle, sheep, or persons to cross and recross my land to go to the government land. I gave them instructions that I didn't want them to graze my land, and, if necessary, I would furnish horses to help them cross my land to any government land they wanted to go to. * * * I constructed the fence along my own land, except, I think, in two places. It run a little on government land in 34, 18, 13, I believe, and also it crossed a piece of government land at the north end. All the government land that I could possibly exclude I did, and would that if it was of any consequence, but I wanted to get the line as straight as I could there, section 34, 18, 13. * * * This fence that has been constructed was not constructed, having in view the acquisition of any land by homesteaders or others. My principal object in erecting that fence was to keep my cattle from straying off onto the plains and going to the swamps. My second object was to keep them off the farmers, because I knew I would have trouble with them if I didn't."

So that, in reality, whether essential or not, the intent and purpose with which the fencing was maintained, if at all, was made an issue in the case, the defendant seeking to show a lawful rather than an unlawful intent and purpose, and this to excuse his acts in view of the law.

As to the reason first assigned, that the testimony tended to show knowledge on the part of the accused that the lands inclosed were public lands, it may be that the defendant was bound to know that fact and it was sufficient for the government to prove, prima facie,

that the lands were yet a part of the public domain. However, it is made incumbent upon the government to show that the accused had no claim or color of title to the lands, made or acquired in good faith, nor an asserted right thereto by or under claim made in good faith with a view to entry thereof in the proper land office under the general laws of the United States at the time. The government is required to allege as much. United States v. Churchill (D. C.) 101 Fed. 443. And, being required to allege it, it is also required to prove it.

Clearly, while the testimony may show an unlawful arrangement whereby to procure the lands from the government without compliance with the statute, it tends to show want of any claim or color of title made or acquired in good faith, or any asserted right by or under claim made in good faith, with a view to entry. It tends to show that, while the defendant would have fraudulently possessed himself of the title if he could, yet he acquired no such right or claim to any of the land in good faith. For this reason, if for no other, the proofs were competent and pertinent.

We are of the opinion, also, that the evidence was competent and pertinent to show the intent, motive, and purpose of the accused in maintaining the fencing. In the case of Potts v. United States, 114 Fed. 52, 51 C. C. A. 678, the defendant constructed fencing wholly upon his own land, inclosing two sections, one lying north of the other. The county road ran along on the east of the inclosure, and certain tracts of the government lands were situated to the west. The defendant's fences were so connected with the fences of other owners that they formed a chain, thus constituting a barrier between the public land in question and the county road. The trial court instructed that:

"The inclosure by a fence, or a combination of fences, or joining of fences that is wholly upon the land which the person does own, is unlawful, if, in effect, it does inclose and shut out the public from any part of the public domain. A man has no right to build a fence upon his own land that connects with another fence that is so connected as to form an inclosure of public land, and shut the public out, or prevent their passage over the public lands."

The case was reversed on account of this instruction, this court, speaking through Morrow, Circuit Judge, saying:

"It is evident that this portion of the country is not well populated, and that public roads are few, as the greater part of the public land claimed to be unlawfully inclosed by the fence in question is two miles from the county road. Upon this evidence, it was clearly the duty of the court to submit to the jury the question whether the defendant's fence or inclosure was erected by him in good faith to inclose his own land, or whether in joining his fence to that of others it was his intent and purpose to prevent or obstruct any person from peaceably entering upon or establishing a settlement or residence upon the tract of public land described in the indictment."

That was a case where the proof of the intent, motive, or purpose with which the fencing was constructed was an absolute essential to the maintenance of the prosecution for the offense charged. The fence had been wholly constructed on the accused's own land—a thing which he had a right to do, unless he did it with the ulterior purpose, by con-

joining with the fences of other owners, so it is held, of inclosing the public lands of the general government. It was only the intent and purpose with which the fencing was done that would render it unlawful. The case at bar is somewhat analogous. The fencing is from 40 to 45 miles in length. Of itself it incloses nothing, and it is disputed whether the country to the west is of such a nature as to form a barrier to free access to the lands within. The fencing generally was constructed upon the lands of the defendant, and it was material to show that his purpose was to construct a practical inclosure of public lands, or to impede free access thereto, and that it was not designed only to prevent the ranging of stock in certain directions, as contended by him. The fact that he had knowledge that a portion of the lands embraced between the fencing and the hills on the west was public land, the further fact that he himself owned by far the greater proportion of the lands embraced, together with the fact, if it be a fact, that he was endeavoring to acquire other tracts of the public lands, would all tend to show his purpose and motive in maintaining the lines of fencing. If it be that he was attempting to acquire public lands unlawfully, the inference would be the stronger that his purpose was to avail himself of their use for his exclusive benefit.

[2] The only question remaining is whether the indictment is insufficient to support the verdict. The objection is that it does not sufficiently negative the exception in the statute relating to lands to which the accused may have a claim or color of title or an asserted right, etc. The language of the indictment in that respect is:

"The said S. C. Lillis, so constructing, maintaining, and controlling the said inclosure, then and there having no claim or color of title made or acquired in good faith, or otherwise or at all, to any of said described public lands of the United States, or an asserted right thereto by or under claim made in good faith with a view to entry thereof at the proper land office of the United States, to-wit, the United States Land Office at Visalia, in the county of Tulare, state, division, and district aforesaid, under the general laws of the United States."

The contention is that the negativing language is not by direct and positive statement, and, moreover, that there is a total failure to negative the exception pertaining to "an asserted right."

From the manifest intendment of Congress, it is evident that an error in grammar has crept into the statute. The word "or" preceding the words "an asserted right" should be "nor," and then all would be rendered clear. The statute would then read "no claim or color of title," etc., "nor an asserted right." It is, however, sufficient to negative the exception in the language of the statute, and especially is this so when the question is raised for the first time by motion in arrest of judgment.

Hence the judgment of the district court is affirmed.