UNITED STATES v. RINDGE et al.

(District Court, S. D. California, S. D.   October 27, 1913.)

1. HIGHWAYS (§ 5*)—PRIVATE ROADS—RIGHTS OF PUBLIC.
    Where certain roads were built across a ranch after 1883 by settlers to reach their claims on public land and were used by occasional hunters and pleasure seekers, and the ranch owner never consented to their use by the public, the fact that they were used at some times by persons not settlers, without objection from the owner, was insufficient to make them public highways.

    [Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 6, 7; Dec. Dig. § 5.*]

2. HIGHWAYS (§ 2*)—PUBLIC HIGHWAYS—USER.
    Pol. Code Cal. § 2618, declares that public highways are roads, streets, alleys, etc., laid out or erected as such by the public or, if laid out or erected by others, dedicated or abandoned to the public or made such in actions for the partition of real property, and section 2621 declares that no road or traveled way, used by one or more persons over another's land, shall become a public highway by use or until so declared by the board of supervisors or by dedication by the owner of the land affected. Held that, under such provisions, a road over another's land cannot become a public highway by user.

    [Ed. Note.—For other cases, see Highways, Cent. Dig. § 3; Dec. Dig. § 2.*]

---

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. **HIGHWAYS (§ 1\*)—ESTABLISHMENT—ABANDONMENT—DEDICATION.**

Unless a highway is established by public authority, there must be an abandonment or dedication thereof to the public by the landowner, and, though.this, need not be by express grant nor evidenced by writing, there must be evidence showing an intention to abandon or dedicate the land to the use of the public or proved facts from which such intention may be fairly deduced.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 1, 2; Dec. Dig. § 1.\*]

4. **DEDICATION (§ 20\*)—ABANDONMENT TO PUBLIC USE—EVIDENCE.**

Occasional and irregular travel across a ranch by land claimants and hunters was not evidence of an abandonment or dedication of the land covered by the trails to public use for highway purposes by the owner, nor was 'it evidence of adverse use necessary to establish a presumption of dedication.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 17-30; Dec. Dig. § 20.\*]

5. **HIGHWAYS (§. 155\*)—PUBLIC HIGHWAYS—INTEREST OF UNITED STATES.**

Where certain crossroads through a ranch privately owned were not highways, and there was no access by such ways from the public do-main to a beach road, the United States had no interest in the question whether the beach road was a public highway.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 432-436; Dec. Dig. § 155.\*]

6. **HIGHWAYS (§ 99\*)—ESTABLISHMENT—MAINTENANCE—JURISDICTION—STATE OR FEDERAL AUTHORITY.**

The establishment and maintenance of highways as such over privately owned lands is a matter primarily for the control of state authorities, in which the federal government is not interested.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 323-330; Dec. Dig. § 99.\*]

7. **HIGHWAYS (§ 155\*)—OBSTRUCTION—INJUNCTION—RIGHT TO SUE.**

A private owner of land has no right to enjoin the obstruction of a road unless he can show access thereto over some lawful way, and the federal government has no other or greater rights.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 432-436; Dec. Dig. § 155.\*]

8. **HIGHWAYS (§ 1\*)—WAY OF NECESSITY.**

Ways of necessity are essentially private ways and not public high-ways.

[Ed. Note.—For other cases, see Highways, Cent. Dig. §§ 1, 2; Dec. Dig. § 1.\*]

9. **PUBLIC LANDS (§ 114\*)—PATENT—WAY OF NECESSITY—IMPLIED RESERVA-TION.**

In the absence of a reservation in a grant of public land, there is no implied reservation of a right of way over the land granted to afford ac-cess by the public to other land belonging to the government.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 314-322; Dec. Dig. § 114.\*]

10. **EASEMENTS (§ 18\*)—WAY OF NECESSITY.**

Ordinarily a way of necessity arises when the owner of a tract of land conveys a portion thereof to another and there is no access from a pub-lic highway to the land conveyed except over the grantor's remaining land or that of a stranger, or when the owner sells a portion of his land and the part remaining is inaccessible except over the land sold or that of a stranger, and such right does not arise where the claimed way is

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

merely more convenient or desirable than some other way because of the mountainous character of the country, etc.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 50–55; Dec. Dig. § 18.*]

11. EASEMENTS (§ 18*)—WAY OF NECESSITY—TIME OF NECESSITY.

In order to establish a right to a way of necessity, the necessity must exist at the time of the grant and as to the whole tract conveyed or reserved, since neither a grantee nor grantor can subsequently subdivide his land and sell off a portion in such a manner as to create a way of necessity in favor of his grantees over parts previously granted unless the way rests in grant or the easement is an apparent and continuous one, existing and in use at the time of the conveyance.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 50–55; Dec. Dig. § 18.*]

12. PUBLIC LANDS (§ 19*)—FENCE LAW—EFFECT.

Act Cong. Feb. 25, 1885, c. 149, § 1, 23 Stat. 321 (U. S. Comp. St. 1901, p. 1524), prohibits the inclosure of public land, and section 3 forbids obstruction to or prevention of entry on or free passage over or through public lands by force, threats, intimidation, or unlawful fences or inclosures. Held, that such act was simply intended to preserve access to the public domain and was not intended to interfere with the use and enjoyment of private property unless such use was a mere subterfuge for inclosing or preventing access to the public domain; and hence the act did not prevent a property owner from constructing fences in good faith on her own land to protect the same against trespass, and useful for the proper enjoyment of such land, without any intention of appropriating or inclosing public lands or preventing lawful access thereto.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

In Equity. Bill by the United States against May K. Rindge, as executrix of the will of Frederick H. Rindge, deceased, and others. Bill dismissed.

A. I. McCormick, U. S. Atty., and H. L. Dunnigan, Special Asst. U. S. Atty., both of Los Angeles, Cal.

James A. Anderson and E. E. Millikin, both of Los Angeles, Cal., for defendants.

BEAN, District Judge. This is a suit brought by the government against May K. Rindge et al. to compel the abatement and removal of certain gates and fences erected and maintained by Mrs. Rindge on her own premises on the ground that the same are obstructions to public highways and ways of necessity and an unlawful inclosure of public lands of the complainant, in violation of the Act of Congress of February 25, 1885, c. 149, 23 St. at L. 321 (U. S. Comp. St. 1901, p. 1524).

The case as made by the record is this: At the time of the cession of California to the United States by Mexico, there was a tract of land of 100,000 acres or more in what is now Los Angeles county, lying along the coast from the Rancho Santa Monica to Point Mugu, a distance of about 35 miles. It was from five to ten miles wide and extended north to and beyond the Calabasas Road, then and now one of the main highways from Los Angeles to points north. It was

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bounded on the south by the Pacific Ocean, and on the north, east, and west by land previously granted by the King of Spain to private individuals. A range of mountains known as the Santa Monica Mountains extends through the tract east and west, three or four miles back from and approximately parallel with the coast, and between it and the Calabasas Road.

In 1852 the successor in interest of one Tapia applied to the board of commissioners to ascertain and settle private land claims in the state of California (as provided by the Act of Congress of March 3, 1851, c. 41, 9 Stat. 631) for an order confirming his title to a portion of the land referred to, alleging it to have been granted to Tapia by the King of Spain in 1804. Thereafter such proceedings were had that on October 24, 1864, a decree was regularly made and entered by the United States Court for the Southern District of California confirming the petitioner's title to the land "known by the name of Topanga, Malibu ——— Sequit, extending from a place named 'Topanga,' the dividing line between these lands and the rancho of 'Santa Monica' on the southeast along the Pacific to a point called Mogu on the northwest and bounded on the northeast by a ledge of rocks on the top of and extending the whole length of a range of mountains, and adjoining the lines of the ranchos of 'Las Virgeues,' 'Triunfo,' 'Santa Ysabel,' and 'Conyo.' Said confirmation being hereby made to the extent of three square leagues within said mentioned boundaries." There were more than ten square leagues within the exterior boundaries of the larger tract described in the decree. The portion thereof, the title to which was confirmed to the petitioner, was surveyed by the government of the United States in 1871, and in August, 1872, patent was regularly and duly issued therefor. It is known and referred to in the record as the Malibu Ranch and lies along the coast for about 16 miles west from Las Flores Canyon, a point some 3 or 4 miles west of Topanga, and is from 1½ to 2½ miles wide and contains about 13,000 acres.

The remainder of the tract was surveyed as public lands in 1896 or 1897. A small portion thereof has been patented to settlers, but the larger area still remains a part of the public domain. The Malibu Ranch lies along the foot of the mountains referred to in the decree, two or three miles south of the summit. Extending from the summit of the mountains through the public lands and across the ranch to the ocean are numerous spurs or ridges, in the bottom of the canyons between which spurs are limited areas of agricultural land. The sides of the canyons back of the ranch are in many places so steep and rugged as practically to prevent access north and south from one to the other. The land north of the mountains and between that and the Calabasas Road is more or less broken with small valleys in the canyons.

Prior to the acts complained of in this suit the Malibu Ranch was for the most part wild uninclosed land used principally for grazing stock. From time immemorial there has been more or less travel onto the ranch from the east by persons on horseback, with wagons and vehicles, and an occasional traveler across the ranch to and from Ven-

tura and points north. The travel was on the true ocean beach, except at certain points where it was not possible to use the beach, and then over the hard ground adjoining. About 1884, and while the ranch was uninclosed, persons commenced to enter upon the unsurveyed public lands in the canyons back of it and make settlements, traveling along the beach from the east to the particular canyon in which they settled, and then over and across the ranch on roads or ways built by them. There has always been considerable controversy between the settlers and others and the owners of the ranch as to the right of the former to use the roads or to travel over or across the ranch.

About 1905, or shortly prior thereto, the owner of the ranch, at considerable expense, constructed a good substantial private wagon road and commenced the construction of a railroad along the front of the ranch near the beach. These improvements naturally attracted attention, and the publicity given thereto caused a large number of persons to visit and examine the public lands back of the ranch with a view of settlement thereon, traveling over the ranch, to the annoyance and inconvenience of the owner. To protect her property from injury by travelers and from fires set by them, the owner built in 1907, and now maintains, a fence a few hundred yards long across the beach road, where the mountains come down close to the ocean at a point three or four miles from the east end of the ranch, which with other fences and natural barriers on the west and north practically incloses the ranch, and she has also maintained fences and closed gates across the beach road at other points to the west.

This suit was brought by the government for a decree enjoining and restraining the defendant from maintaining such fences or obstructions on the ground: (1) That the beach road and the roads used by the settlers up the various canyons are public highways and necessary for access to the lands of the complainant; (2) that at the time patent was issued for the ranch there was reserved by implication to the government and its grantees a right of way over the land so patented to the public land back thereof, because there was and is no other practicable way to reach such land from a public highway; and (3) that the construction and maintenance of the fences and gateways in question, although on the defendant's own land, constitute an unlawful inclosure of public lands within the meaning of the act of Congress of February 25, 1885.

The record is exceedingly voluminous, consisting of many thousand pages of testimony and numerous exhibits showing the nature, extent, and character of the travel over and through the ranch, the topography of the country back of the ranch, its accessibility from a highway on the north and across the mountain range, the cost and expense of building roads over the government land, and the like. The prodigious industry of counsel in abstracting and classifying the testimony and their able and exhaustive arguments have relieved the court of a vast amount of labor, and I take this opportunity to express my appreciation thereof. Without the aid thus afforded, an intelligent understanding of the case would have been almost hopeless. A great bulk of the testimony and a considerable portion of the argument were directed

to the issue concerning the existence of a highway along the front of the ranch and next to the ocean, but, as I view the matter, it is unnecessary to consider that question. The evidence signally fails to show that the roads leading from the beach across the ranch are public highways, and, if they are not, the government has no concern with the controversy as to the existence of such a way along the beach, since it has no access thereto by a public way. All the roads across the ranch were built and maintained by the settlers, either with the express or implied consent of the landowner, and were nothing more than mere private ways. There are 12 such roads, known in the record as the Las Flores Canyon Road, the Bieule Road, the Carbon Canyon Road, the Malibu Canyon Road, the Puerco Canyon Road, the Corral Canyon Road, the Sosto Canyon Road, the Latigo or Escandido Canyon Road, the Suma Canyon Road, the Trancas Canyon Road, the Encinal Canyon or Decker Road, and the Nicholas Canyon Road. None of these roads were established by public authority, nor has any public money ever been used in their construction or maintenance or repair, and they have never been recognized as public highways by the public authorities and have never been fenced or in any way separated from the surrounding territory.

The Las Flores Canyon Road is along the east end of the ranch and but a small portion of it, if any, is on the ranch. It has been traveled since 1889 by two or three settlers and by hunters.

The Bieule and Carbon Canyon Roads were built in 1890 and 1898, respectively, by express permission of the owners of the ranch, and there has been very little travel over either of them.

The Malibu Canyon Road was built some time after 1885 and extends up the canyon about half a mile beyond the ranch line and ends on private land. The canyon is steep, has rugged sides, and there is no public land, as I understand the record, accessible from this road or any possible extension thereof. There has been no particular travel over the road except by a few settlers in the canyon and by hunters and trappers.

The Puerco Canyon Road was built by Carey and Daman in 1897 or 1898 and was used by them.

The Sosto Canyon Road was built by Swinney about 1894 with the permission of the owners of the ranch.

The Latigo or Escondido Canyon Road was built by Reeves and Swinney after their settlement in 1890 and a part of it by permission of the owners of the ranch.

The Suma Canyon Road was built by Bandy after his settlement in 1894 and used by him.

The Trancas Canyon Road was built by Haworth about 1885 in order to reach his home.

Decker settled in Encinal Canyon in 1885 and has continued to reside there ever since. The road from the beach across the Malibu Ranch was built by him in 1885 or 1886 and has since been extended to the public lands back of his place and over and across the mountains intersecting the Calabasas Road on the north. There are several settlers along this road near the summit of the mountains who sometimes

use the road to the south across the Malibu Ranch but more frequently the road to the north.

The Nicholas Canyon Road was built by Swinney and Nicholson for their own use some time after 1885.

[1] Each of these roads was therefore built after the year 1883 by settlers to reach their claims and was used for that purpose and by occasional hunters and pleasure seekers. The roads were unquestionably private ways in the first instance, and it does not appear that the landowner ever consented to their change to public highways, nor is there any element of estoppel shown to deprive her of her rights as owner of the fee. The mere fact that the roads were used by persons not settlers, without objection from the landowner, will not make them public highways. Elliott on Roads and Streets, § 5.

[2] The act of the Legislature of California of February 28, 1883, which has since been in force, and is now sections 2618 and 2621 of the Political Code, declares:

"In all counties of this state public highways are roads, streets, alleys, lanes, courts, places, trails, and bridges, laid out or erected as such by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such in actions for the partition of real property." Section 2618.

"And no route of travel used by one or more persons over another's land shall hereafter become a public road or byway by use, or until so declared by the board of supervisors or by dedication by the owner of the land affected." Section 2621.

Under these statutory provisions a road over another's land does not become a public highway by mere user alone.

[3] Unless it is established by public authority, there must be an abandonment or dedication to the public by the landowner. The abandonment or dedication need not be by express grant nor evidenced by writing, nor indeed be in form of words, oral or written, but may be inferred from other circumstances. It may be established in any conceivable way by which the intention of the owner to dedicate or abandon the land to the public for a public way can be manifested (Elliott on Roads and Streets, § 137; People v. Davidson, 79 Cal. 166, 21 Pac. 538; Sussman v. San Luis Obispo, 126 Cal. 536, 59 Pac. 24; Plummer v. Sheldon, 94 Cal. 533, 29 Pac. 947) and may be presumed from adverse user by the public under a claim of right with the knowledge of the owner for a period of time corresponding to that fixed for conferring title by prescription (People v. Myring, 144 Cal. 351, 77 Pac. 975; Schwerdtle v. Placer County, 108 Cal. 589, 41 Pac. 448; Hartley v. Vermillion, 141 Cal. 339, 74 Pac. 987). But there must be evidence showing an intention to abandon or dedicate the land to the use of the public, or proven facts from which such intention can be fairly deduced, and, unless the intention expressly appears or can be inferred from acts done or omitted, there is no proof of dedication or abandonment. Elliott on Roads and Streets, §§ 138–173; Silva v. Spangler, 43 Pac. 617;[1] Irwin v. Dixon, 9 How. 10, 13 L. Ed. 25; Coburn v. San Mateo County (C. C.) 75 Fed. 520. The question is always one of fact.

---

[1] Reported in full in the Pacific Reporter; reported as a memorandum decision without opinion in 111 Cal. xvi.

[4] Now the occasional and irregular travel across the ranch by the land claimants and hunters, the principal users of the ways, without more, is not evidence either of the abandonment or dedication of the land to the public use by the owner, nor does it constitute the adverse use necessary to establish a presumption of such dedication.

[5] As the crossroads are not highways, and there is no access by such a way across the ranch from the public domain to the beach road, the government has no interest in the question whether the latter is a public highway or not.

[6] The establishment and maintenance of highways, as such, over privately owned lands belongs primarily to the state authorities and not to the government of the United States. The character of the beach road is now in litigation in the state courts and should be determined there. This suit is maintained by the government as a landed proprietor, and on this branch of the case it is entitled to no greater relief than if it had been brought by a private owner claiming that a public highway leading to his land was unlawfully obstructed.

[7] Certainly a private owner of land back of the Malibu Ranch would have no standing in a court of equity to enjoin the obstruction of the beach road, unless he could show access to such road over some lawful way. The government has no other or greater rights.

The alleged ways of necessity: The defendants claim that ways of necessity, as such, were unknown to the Spanish law, and, since they derive title from the King of Spain, their property cannot be so burdened. The complainant challenges the soundness of this position and argues that in any event the grantee from the King of Spain and the complainant were tenants in common of the larger area described in the decree of confirmation of August, 1864, and the subsequent survey and patenting of the ranch was in effect either a grant from the government of the United States or a partition of the property, and hence the common-law doctrine of ways of necessity is applicable thereto.

I shall not stop to consider these questions, interesting as they are, but shall assume for the purpose of the decision that the defendant holds title as grantee of the government of the United States, the view most favorable to the complainant.

In considering the government's contention, it is important to get a clear view of its position and the consequence thereof. In effect it is that, at the time the patent was issued, there was reserved by implication to it and its subsequent grantees, however numerous, rights of way to be subsequently located over and across the ranch to reach the several portions of the government land, although there is no such provision in the patent, and there was no law in force at the time reserving such a right. The claim is that there was so reserved a way along the beach practically the entire length of the ranch, and also numerous ways across the ranch and up the several canyons.

[8] These roads will, if decreed, be in effect public highways, although ways of necessity are essentially private ways. The government is not asserting a right of passage over the ranch for governmental purposes alone, or as a mere landowner, but seeks to have

ways established for the use and benefit of present and subsequent settlers on the public domain. In other words, it is asserting rights of way for the use of such of the public as may have occasion to visit the public domain for settlement, pleasure, business, or any other lawful purpose.

[9] The logical result of this contention is that a way is reserved by implication for the use of such persons over all land granted by the government to reach the remaining subdivisions when there is no other reasonable or convenient means of access, notwithstanding there is no such reservation in the grant, and there is no public law so providing. A doctrine so contrary to the general theory of the rights acquired by patentees of public lands and guaranteed to private owners by the Constitution challenges attention. Its effect is strikingly apparent in the case at bar.· The result of the government's position, if sustained, will be to divide the Malibu Ranch by what are in effect public highways into 10 or 12 different tracts, thus materially impairing its value and usefulness to the owner, and that without compensation. It is, in my judgment, very doubtful whether the doctrine of implied ways of necessity has any application to grants from the general government, under the public land laws. Pearne v. Coal Coke Co., 90 Tenn. 619, 18 S. W. 402; Bully Hill C. M. & S. Co. v. Bruson, 4 Cal. App. 180, 87 Pac. 237. If it exists at all, it can be invoked against the government and its grantees as well as in their favor. Hence every grantee of a portion of the public domain from the time the land laws were extended over the same and those succeeding to his title would have an implied right of way over the surrounding and adjacent public lands, and a junior grant thereof if necessary to reach his own land, and a junior grantee and his successors in interest would have such a way over a prior grant under similar circumstances simply because they derive title from a common source. The public domain is disposed of under general laws, and the rights conferred and reserved are defined by such laws, and rules and regulations made in pursuance thereof. If the sale or conveyance of one portion of such domain prevents access to another, it would seem to be a contingency which the government was bound to contemplate in making the conveyance. By public statute Congress has granted rights of way for the construction of highways over public lands not reserved for public use. Act of Congress July 26, 1866, c. 262, 14 Stat. at L. 253. Beyond this and the full protection of the title which it confers, it would seem that the government owes no duty or obligation and reserves to itself or its subsequent grantees no interest in the land granted except such as may appear on the face of the grant, or the law under which it was made, or be declared by a general statute in force at the time the interest of the grantee was acquired. But assuming that the doctrine of ways of necessity can be invoked by the government for the benefit of its grantees, as against a prior grantee, is there any ground for its application here?

[10] What is commonly called a right of way from necessity arises when the owner of a tract of land conveys a portion thereof to another and there is no access from a public highway to the part so

conveyed except over the remaining lands of the grantor, or a stranger, or when the owner sells a portion of his land and the part remaining is inaccessible except over the land sold or that of a stranger. It is not strictly accurate to say one man has a way of necessity over the land of another. The necessity of one man, however great, will not of itself give him an interest in the property of another or justify entry on another's land. The fact that there is no way to the land sold except over the remaining land of the grantor, or that the remaining land of the grantor is not accessible except over the land granted by him, is only a circumstance resorted to for the purpose of ascertaining the intention of the parties to the grant and to raise an implied grant or reservation of a way, because where a thing is granted or reserved the law implies a reservation or grant of that which is necessary to the enjoyment of the thing granted or reserved. Goddard on Easements, p. 262; Bishop on Noncontract Rights (Ed. 1889) § 872; Jones on Easements, § 154. This rule is usually invoked in favor of a grantee but has been held to apply where one sells lands surrounding other lands belonging to him, thus cutting off access to his remaining lands except over the granted premises. It is said that by implication he reserves a way over the land granted, even though there is no such provision in his deed and he conveys with covenant of warranty. 2 Washburn on Real Property, 282. But in such case the rule of strict necessity applies, because the grantor is claiming something in derogation of the deed which he has given, and the title which he has conveyed, and if he intends to reserve any greater right over the land granted it is his duty to expressly so provide in the grant. Neither inconvenience or even great inconvenience is enough. There is no implied reservation of a way by implication in favor of a grantor unless in case of strict necessity and when he has no other practical means of approach to his land. Washburn on Easements (2d Ed.) 219; Jones on Easements, 155–318; 14 Cyc. 1171–1176. As said by the Supreme Court of California in Kripp v. Curtis, 71 Cal. 62, 11 Pac. 879:

"The right of way from necessity must be in fact what the term naturally imports and cannot exist except in cases of strict necessity. It will not exist where a man can get to his property through his own land. That the way over his own land is too steep or too narrow, or that other and like difficulties exist, does not alter the case."

A right of way over another's land is, in its final analysis, an interest therein, and when sought on behalf of a grantor contrary to his deed it should never be implied except in case of strict or extreme necessity. That it will be more convenient or desirable than some other way is not sufficient. The fact that there is a bluff or mountain across the grantor's land which is difficult to pass, or that a way through his land is obstructed or will be expensive to construct, or is steep or hilly, or that the public way to which he has access is in such a bad condition that it is impossible to haul more than small loads over it, and the like, is no reason for implying a grant or reservation of another way. Goddard on Easements, 270; Gaines v. Lunsford, 120 Ga. 370, 47 S. E. 967, 102 Am. St. Rep. 109; McDonald

v. Lindall, 3 Rawle (Pa.) 492; Dee v. King, 73 Vt. 375, 50 Atl. 1109; Nichols v. Luce, 24 Pick. (Mass.) 102, 35 Am. Dec. 302; Pousson v. Porche, 6 La. Ann. 118. Implications of grants or reservations of ways of necessity are looked upon with jealousy and construed with strictness because they are contrary to the deed of conveyance. It is only the necessity of the case that will carry such a way.

Now, applying these principles to the facts and the result, in my judgment, is manifest. At the time the patent was issued for the Malibu Ranch, access to the ranch and to the canyons leading through it to the public lands from the coast was most difficult. It was impossible to do so from the west with any kind of a vehicle, and it was practically impossible to get within eight or ten miles of the ranch from the east with a wagon on any kind of a road. The way from the east was along the beach through dry sand, over rocky points, and was beset with so many difficulties that it was rarely used. On the other hand, the public land north of the ranch was accessible at that time from the Calabasas Road, and it would seem, as stated by Mr. Justice Sloss in a similar case, that "this circumstance alone is fatal to the existence of a way by necessity." Corea v. Higuera, 153 Cal. 451, 95 Pac. 882, 17 L. R. A. (N. S.) 1018. It is true that, in order to reach the public land south of the mountains and west of Malibu Canyon from the Calabasas Road, it is necessary to cross the mountains, but they are not impassable barriers. The evidence shows that roads can be constructed across them, and it is doubtful whether, if the conditions were now the same as when patent issued, it would cost more to build such roads than to construct ways to the public lands from the east. One road has already been constructed across the mountains connecting with the Ensinal Canyon or Decker Road and is now being used by the settlers. Others can be built to serve the land between this road and the Malibu Canyon. The land east of Malibu Canyon is accessible by an extension of the Las Flores Canyon Road. The fact that these roads would be expensive to construct and would be steep and difficult and not as convenient or desirable as ways from the east or south does not alter the case. They will afford access to the government land, and therefore it cannot be said that there is no way thereto other than across the ranch.

There is a vast amount of testimony in the record as to estimated cost of building roads from the north to reach the government land south of the mountains. The witnesses differ widely, as is often the case with experts. I do not think it is necessary to examine the evidence in detail. All agree that such roads can be built. The evidence for the government tends to show that it will cost from $75,000 to $100,000 to build highways of not to exceed a maximum grade of 12 per cent., and what are designated as "haphazard roads" can be built for about two-fifths of that sum. Experts of apparently equal intelligence and experience testify for the defendant that good substantial roads, such as are common in similar mountainous regions and which will serve the purpose of settlement, can be constructed at a comparatively small outlay. But, taking the estimates of the government's witnesses as correct, I am not prepared to say that the cost

of building the roads would be so disproportionate to the value of the land as to be prohibitive. The question is not to be determined by comparing the value of any particular subdivision with the cost of a road to it but the relative value of the entire tract to be served with the cost of building roads to reach it. It will no doubt cost more to build roads under present conditions from the north than from the south, but neither that fact nor the fact that it will be more convenient for settlers south of the mountains to approach their homes from the ranch side is any reason why the owners of the ranch should be compelled to suffer the loss and inconvenience of having numerous public highways across their property without compensation therefor.

[11] There is another reason why, in my judgment, the government's position is unsound. The necessity from which the law implies a grant or reservation of a way must exist at the time of the grant and as to the whole tract conveyed or reserved. Neither a grantee nor a grantor can subsequently subdivide his land and sell off a portion in such a manner as to create a way of necessity in favor of his grantees over the parts previously granted (Lankin v. Terwilliger, 22 Or. 97, 29 Pac. 268; Jones on Easements, p. 304), unless perhaps the way rests in grant or the easement is an apparent and continuous one, existing and in use at the time of the conveyance (3 Washburn on Real Property, p. 284).

If the land described in the decree of August, 1864, had belonged to a private individual and he had sold the portion now owned by the defendants and conveyed the same by absolute deed without reservation, it would hardly be contended that he could subsequently subdivide the remaining area into 80 or 160 acre tracts and by conveying the same to sundry persons invest in each a right of way over the portion first conveyed, and it is not believed the government has any other or greater rights.

What has already been said would seem to dispose of the question that the fences complained of should be abated because in violation of the act of Congress making it unlawful to inclose public lands, since if, as I conclude, the public lands can be reached without crossing the ranch, the fences in question do not constitute an inclosure thereof or an obstruction to an entry thereon. But, however that may be, the fences are on defendant's land a considerable distance from the exterior boundaries thereof. The one first encountered in journeying to the public lands through the ranch is three or four miles from the east end of the ranch and cannot be approached without traveling for that distance over defendant's property, unless it is across a public highway, a question not important to the point now under consideration. After passing the fence, it is necessary to travel several miles over defendant's land before reaching the public domain. The other fences are across the beach road west of the one just referred to. The abatement of the fences, therefore, would not permit access to the public domain without trespassing on privately owned land, and I am unable to comprehend how such structures can be held to be in violation of the act of Congress.

[12] The Fence Law, as its title implies, was intended to prevent unlawful occupancy of public lands. To that end it makes the inclosure of such land illegal (section 1) and forbids obstruction to or prevention of the entry thereon or free passage or transit over or through the same by force, threats, intimidation, or by unlawful fences or inclosures (section 3). But it was not intended to interfere with the use and enjoyment of private property unless such use is a mere subterfuge for inclosing or preventing access to the public domain. I do not understand that Congress intended to interfere with the use of privately owned lands or the erection of such fences or structures thereon as are reasonably necessary for the full and free enjoyment thereof or to permit or sanction trespass thereon or confer or recognize a right of passage over the same. It was not concerned with the initiation or creation of means of access to public lands but with the matter of keeping the boundaries thereof open so that all persons who could lawfully reach the same might enter. If it had intended or contemplated, as now claimed for the government, the use of a way over privately owned lands to reach the public domain, it would no doubt have so indicated and probably made some provision by which such way could be fixed and located.

It is true that if one builds a fence on his own land which does not inclose the same, but the natural effect of which is to inclose public lands, either separately or together with his own, he will be held to have violated the statute, regardless of the actual intent with which the fence was built or maintained, because every person is presumed to intend the natural and probable consequences of his own act. Homer v. U. S., 185 Fed. 741, 108 C. C. A. 79; Golconda Cattle Co. v. U. S., 201 Fed. 282, 119 C. C. A. 519. But I know of no decision holding that a fence built on one's own land in good faith for the sole purpose of enabling the owner to use and occupy his property, and not as a guise for inclosing public lands, to be an unlawful structure, although it may incidentally interfere with access to the public domain, for, as said by Mr. Justice Brown in Camfield v. U. S., 167 U. S. 528, 17 Sup. Ct. 868, 42 L. Ed. 260:

"So long as the individual proprietor confines his inclosure to his own land, the government has no right to complain, since he is entitled to the complete and exclusive enjoyment of it, regardless of any detriment to his neighbor."

It is only when, "under the guise of inclosing his own land, he builds a fence useless for that purpose, and which can only have been intended to inclose the lands of the government," that he comes within the statute and is guilty of an unwarrantable appropriation of that which belongs to the public at large. The same doctrine is declared by the Court of Appeals of this circuit in Potts v. U. S., 114 Fed. 52, 51 C. C. A. 678; Hanley v. U. S., 186 Fed. 711, 108 C. C. A. 581; Lillis v. U. S., 190 Fed. 530, 111 C. C. A. 362. In the Potts Case it is said:

"The act of a person in fencing or inclosing his own land is lawful. It is also lawful for a person to fence and inclose his own land up to a point where it connects immediately with the fence or inclosure of adjoining land owned by another. It is only when, under the guise of inclosing his own land, a person builds a fence for the purpose and with the intention of inclosing

the public lands of the government that the fence or inclosure becomes unlawful."

And in the Hanley Case the following instruction given by the trial court was approved:

"A person has a right, under the law, to erect fences wholly upon his own land and to maintain them if he so desires, and if incidentally such fences may obstruct or impede the ingress or egress of stock ranging upon the public lands, or the free passage of persons upon or over such lands, no one can complain, because a man has a right to do what he pleases with his own, so long as he does no willful injury to another."

It is true the cases referred to were criminal, but the court was construing the Fence Law and distinguishing a lawful from an unlawful inclosure, and I can conceive of no difference in this regard between a civil and a criminal case. A fence cannot be deemed a lawful structure in a civil proceeding and an unlawful one in a criminal case, or vice versa.

I have not overlooked the fact that there are decisions cited by the complainant, the logical effect of which would seem to support the government's contention, but as said by Mr. Justice Moody, in Telephone Co. v. Los Angeles, 211 U. S. 274, 29 Sup. Ct. 52, 53 L. Ed. 176:

"No case, unless it is identical in its facts, can serve as a controlling precedent for another."

The fences in question, as I understand the record, were and are reasonable and proper means of protecting the defendant's land from trespass and useful for the proper enjoyment thereof. They were built by her in good faith with no intention of appropriating or inclosing public lands or preventing lawful access thereto. In connection with fences and natural barriers on the west and north, they amount to a substantial inclosure of privately owned lands, and the crux of the question, then, is whether the defendant can use reasonable, proper, and appropriate means to inclose her own property without violating the federal statutes. In my judgment she can.

The complaint will be dismissed.