# Rights-of-Way Across National Forests

The Act of June 4, 1897, does not grant a right of access to owners of land surrounded by national forests, other than actual settlers, and the Secretary of Agriculture has discretionary authority to deny such access unless a right otherwise exists.

The common law doctrine of easement by necessity does not apply to land owned by the federal government, but a right of access may be implied from the terms of a federal land grant in some circumstances. No statutes currently modify any such implied right found to exist.

Absent a prior existing access right, the Secretary of Agriculture may deny "adequate access" to land within a national forest wilderness area, but must offer a land exchange as indemnity.

June 23, 1980

THE SECRETARY OF AGRICULTURE

MY DEAR MR. SECRETARY: This replies to your letter of September 18, 1979, requesting my opinion on several questions concerning access rights of private owners of land located within the boundaries of the national forests. Your letter poses the following questions:

(1) Whether the Organic Act of June 4, 1897,[1] grants to private landowners,[2] other than actual settlers, a right of ingress to and egress from their properties located within the exterior boundaries of the national forests, or whether you may deny such access;

(2) Whether private landowners with property located within the exterior boundaries of the national forests have a right-of-way across national forest lands by implied easement or easement by necessity enforceable against the federal government; and, if so, whether this right-of-way is limited to those instances in which the United States by its conveyance created a situation in which nonfederal lands are surrounded by public lands;

(3) Whether, if a right-of-way exists across national forests, it has been modified by:

(a) The Organic Act of June 4, 1897, 16 U.S.C. § 478;
(b) The Wilderness Act, § 5(a), 16 U.S.C. § 1134(a);
(c) The Act of October 13, 1964, 16 U.S.C. §§ 532–538;

---

[1] Act of June 4, 1897, ch. 2, § 1, 30 Stat. 36 (codified at 16 U.S.C. § 478).

[2] As used in this opinion, the term "private landowners" refers to all nonfederal landowners unless otherwise indicated.

(d) The Montana Wilderness Study Act of 1977, § 3, 16 U.S.C. § 1132 note; or

(e) Any other statute; and

(4) Whether § 5(a) of the Wilderness Act, 16 U.S.C. § 1134(a), authorizes you to deny access and offer as indemnity an exchange of national forest land for private land, or whether the private landowner may insist on a right of access.

I conclude, first, that the Organic Act of June 4, 1897, does not grant a right of access to owners of land surrounded by national forests, other than actual settlers, and that you have discretionary authority to deny such access, provided that a right of access does not otherwise exist. Of course, access cannot be denied arbitrarily.

Second, in my opinion, the common law doctrine of easement by necessity does not apply to land owned by the federal government. A right of access may be implied from the terms of a federal land grant only if Congress intended to grant the right. This intent may be shown from the circumstances surrounding the grant, including the purpose for which it was made.

Third, none of the statutes you have asked us to consider, nor any others that we have found, would modify such a right in any case in which it is found to exist.

Fourth, I conclude that, absent a prior existing access right, you may deny "adequate access" under the Wilderness Act, but you must offer a land exchange as indemnity.

## I.

Your first question is whether Congress has given private inholders [3] a statutory right of ingress and egress with respect to their property, including a right to build roads. Congress clearly has the power to grant such statutory rights.[4] The question is whether it has done so.

Your department concludes that the Organic Act of June 4, 1897, grants a right of access, including a right to build roads, to all owners

---

[3] An "inholder" is a landowner whose property is completely surrounded by property owned by the United States. Again, as used in this opinion the term "private inholder" refers to all nonfederal inholders.

[4] The power to control public lands is granted to Congress by the Constitution:

The Congress shall have Power to Dispose of and make all needful Rules and Regulations respecting the Territory or other property belonging to the United States. . . .

U.S. Const., Art. IV, § 3, cl. 2. This comprehensive congressional authority over public lands includes the power to prescribe the times, conditions, and mode of transfer *(United States v. Gratiot,* 39 U.S. (14 Pet.) 526, 537-38 (1840)); to declare the effect of title emanating from the United States *(Bagnell v. Broderick,* 38 U.S. (13 Pet.) 436, 450 (1839)); and to prevent unlawful occupation of public property *(Camfield v. United States,* 167 U.S. 518, 525 (1897)). In *Kleppe v. New Mexico,* 426 U.S. 529, 539 (1976), the Court stated: "[W]hile the furthest reaches of power granted by the Property Clause have not yet been definitely resolved, we have repeatedly observed that the power over public lands thus entrusted to Congress is without limitation."

31

of land surrounded by national forest reserves. Section 478, the codification of § 1 of the Act, provides:

> Nothing in sections 473 to 478, 479 to 482 and 551 of this title shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. Nor shall anything in such sections prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests.

In 1962, Attorney General Kennedy was asked by the Secretary of Agriculture for his opinion on the meaning of this statute. *See* 42 Op. Att'y Gen. 127 (1962). Prior to 1962, your department interpreted the first sentence of § 478 as granting a right of access to all owners of land surrounded by a national forest. It reasoned that the term "ingress and egress" included the construction of wagon roads, and that the term "actual settlers" included any person or corporation owning property within the boundaries of national forests. As a result, private landowners, including lumber corporations, were considered to have a statutory right to build logging roads. *Id.* at 130. Attorney General Kennedy opined that the term "actual settlers" includes original settlers who reside on the land, and excludes corporations and other business entities.[5] He further concluded that the Secretary of Agriculture has discretionary authority to impose a reciprocity requirement on requests by inholders, other than actual settlers, to use existing roads or to build new roads within national forests. *Id.* at 142–45.

You have advised us that, notwithstanding the 1962 opinion, your department has continued to maintain that § 478 creates a right of access for all private inholders. This interpretation, you have informed us, has been based upon the second sentence of § 478, which was not directly addressed in the 1962 opinion. My review of the reasoning set forth in that earlier opinion, as well as my analysis of § 478 and its legislative history, convinces me that no such access right exists.

The 1962 opinion analyzed § 478 by dividing it into the following three categories: (1) ingress and egress of actual settlers; (2) construc-

---

[5] Between the extremes of the original settler and corporations or business entities are intermediary types of property owners such as heirs or assigns of an actual settler. The 1962 opinion did not consider whether those intermediary property owners are "actual settlers" within the meaning of the Act. 42 Op. Att'y Gen. 127, 138 (1962).

tion of wagon roads and other improvements by actual settlers; and (3) entry upon the national forest for all proper and lawful purposes by any person. *Id.* at 127, 138-39. We are concerned here only with the third category because you inquire as to the rights of landowners other than actual settlers. In this category, "entry upon" may be subdivided into entry by mere ingress and egress, in particular the use of existing roads, and entry requiring construction of roads. Section 478 provides that any entry upon the forest reserve by any person is subject to the rules and regulations covering such national forests. The question now presented, therefore, is whether the Secretary's regulations may, in appropriate cases, include denial of the requested entry.

To determine correctly the scope of rights protected by the 1897 Act, it is necessary to study carefully the language of the Act itself, and its legislative history. As the legislative history is fully summarized in the 1962 opinion, I note only the aspects particularly relevant here. At the outset, it is helpful to review the sequence of events which led to the passage of the Act. During the 1800's the public entered freely upon federal land, and Congress, although it did not provide specific legal authority for most uses of the public domain, made no serious attempt to halt such uses. *See generally* G. Robinson, The Forest Service 2-5 (1978); Clawson & Held, The Federal Lands 46 (1957). This tacit approval constituted an open invitation to the public to avail itself of the federal land without specific authorization. Most people assumed that the United States was a temporary titleholder and that the land would eventually pass into private ownership. *See* R. Robbins, Our Landed Heritage: The Public Domain, 1776-1970, 5-6 (1976). The public land laws of the era, including preemption laws,[6] homestead laws,[7] and mining laws,[8] presumed unimpeded access to the public domain.

This policy of unimpeded access was recognized by the Supreme Court in *Buford* v. *Houtz,* 133 U.S. 320, 326 (1890), a case in which the Court considered the complaints of owners of alternate odd-numbered sections of land that sheepowners were damaging their land by driving

---

[6] The Act of May 29, 1830, 4 Stat. 420-21, first granted preemption rights to settlers. Under its terms, any person who had settled on the public domain and had cultivated a tract of land was authorized to purchase any number of acres up to a maximum of 160 acres upon paying to the United States a minimum price for the land.

[7] The first homestead act was passed in 1862. Act of May 20, 1862, 12 Stat. 392-93. It provided that certain persons could enter unappropriated public lands and, upon satisfying certain conditions, obtain a Government patent therefor.

[8] The Mining Law of 1866 (Act of July 26, 1866, ch. 262, 14 Stat. 251) opened mineral deposits on public lands to exploration, claim, and occupation. The only specific reference to rights-of-way appeared in § 8, which granted a right-of-way for the construction of highways over public lands not reserved for public uses. The Mineral Location Law of 1872 (Act of May 10, 1872, ch. 752, 17 Stat. 91-96) did not mention access across the public domain. From the outset, however, federal mining laws have been construed as an invitation to enter, discover, and locate claims upon public lands not withdrawn or reserved. *See, e.g., Union Oil Co.* v. *Smith,* 249 U.S. 337, 346-47 (1919); *United States* v. *Carlile,* 67 I.D. 417, 421 (1960). *See generally* J. Lonergan, *Access to Intermingled Mineral Deposits, Mining Claims and Private Lands Across Surrounding Public Domain and National Forest Lands,* 8 Land & Water L. Rev. 124 (1973).

sheep across it to reach the even-numbered sections of the public domain. The Court denied plaintiffs' request for an injunction with the following explanation:

> We are of opinion that there is an implied license, growing out of the custom of nearly a hundred years, that the public lands of the United States . . . shall be free to the people who seek to use them where they are left open and unenclosed, and no act of government forbids this use. . . .
>
> The whole system of the control of the public lands of the United States as it had been conducted by the Government, under acts of Congress, shows a liberality in regard to their use which has been uniform and remarkable.

133 U.S. at 326-27. The Court refused to allow the complainants, under the pretense of owning a small portion of a tract of land, to obtain control over the entire tract and thereby deny defendants their privilege to use the public domain. 133 U.S. at 322. *See also, Broder* v. *Water Co.,* 101 U.S. 274, 276 (1879) (Court noted conduct of government encouraging development of mines and construction of canals and ditches on public domain); *Forbes* v. *Gracey,* 94 U.S. 762 (1876) (Court noted tacit consent to enter upon the public lands for the purposes of mining); *Atchison* v. *Peterson,* 87 U.S. (20 Wall.) 507 (1874) (Court noted "silent acquiescence" to the general occupation of the public lands for mining).

In the late 19th century, efforts expanded to protect the Nation's natural resources from the results of what were perceived as overly generous land-use policies. *See* Robbins, *supra,* at 301-24. In 1891, the Congress passed a law authorizing the President to reserve forest lands from the public domain. Act of March 3, 1891, ch. 561, § 24, 26 Stat. 1103. One provision of this Act, § 24, later known as the Forest Reserve Act of 1891, was added as an amendment by the conference committee.[9] The amended bill was considered in the closing days of the Congress on an oral presentation of its terms, no printed version being available. It was approved with little debate.[10] The status of these forest

---

[9] Section 24 provided:

> [T]he President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof.

[10] Some Senators expressed concern about not knowing exactly what was in the report, but the majority felt that in the closing days of the session "there has got to be something taken for granted or else the public business cannot go forward as it should." 22 Cong. Rec. 3546-47 (1891). The brief House debate appears at 22 Cong. Rec. 3613-16 (1891).

34

reserves was not defined, nor were guidelines provided for the management of the reserves.

On February 22, 1897, President Cleveland, pursuant to the 1891 Act, issued proclamations placing approximately 20 million acres of public land in forest reserves. Presidential Proclamations Nos. 19-31, Feb. 22, 1897, 29 Stat. 893-912. Within the boundaries of the reserves were villages, patented mining claims, homestead claims of actual settlers and other developments. *See* 30 Cong. Rec. 901-02 (1897). Each of the proclamations contained the following admonition: "Warning is hereby expressly given to all persons not to enter or make settlement upon the tract of land reserved by this proclamation." *See, e.g.,* 29 Stat. 894 (1897). The proclamations also prohibited the general use of timber on the reserves, and jeopardized other theretofore legitimate activities of persons living within or near the reserves.

Congressmen from states affected by the proclamations expressed outrage at what they considered the President's hasty and ill-advised action. 30 Cong. Rec. 902 (1897). This reaction culminated in the passage of an amendment to the Sundry Civil Expense Appropriation Act, 30 Stat. 36 (1897). This amendment was designed to solve the "difficulties surrounding these forest reservations" *(id.* at 900) and to provide for "administering the forest so reserved" *(id.* at 909).[11] Senator Carter of Montana explained that the amendment was offered "not for the purpose of benefitting any particular individual or class of individuals, but for the purpose of permitting existing communities in the United States to enjoy the privileges which have ordinarily been accorded to the pioneer settlers on the frontier everywhere." *Id.* at 902. Other Senators also criticized the provision prohibiting entry or settlement upon the reserves. *Id.* at 910-11. Senator Allison of Iowa stated: "[I]f segregations are made I think every interest *existing at the time,* however remote it may be, should be protected." *Id.* at 911 (emphasis added). The House debate on the amendment indicates that the congressmen also were concerned about preserving existing uses of the forest reserves. *Id.* at 1007-13 (remarks of Representatives Castle, Knowles, Lacy, and DeVries).[12]

The bill was referred to a conference committee, which reported the bill without changes in or comments upon the access section. *Id.* at 1242-43. During the Senate debate on the conference report, some of the same western Senators on whose behalf the amendment was introduced sought to change the clause "actual settlers residing within the boundaries of national forests" to "bona fide settlers or owners within a reservation." *Id.* at 1278-81. Senator White explained that the provision

---

[11] The amendment temporarily restored the withdrawn lands to the public domain by suspending the operation of the presidential proclamations for approximately one year. 30 Cong. Rec. 899-900 (1897). It also clarified the President's authority to revoke, modify, or suspend such proclamations.

[12] For a complete discussion of this legislative history, see 42 Op. Att'y Gen. 127, 135-38 (1962).

as drafted did not adequately protect all persons who had acquired title in fee from the government. *Id.* at 1278. The amendment was defeated. *Id.* at 1285. Opponents of the amendment emphasized that there was no intent to deprive any person of access to his property, and that "whatever rights have been acquired as respects the public lands under the public land laws are reserved and preserved." *Id.* at 1283. It was noted that entry upon the forests was subject to the rules and regulations of the Secretary of Interior (who then had this administrative authority) and that such rules would not likely prevent access to a person's home. *Id.* at 1280 (remarks of Senator Berry). Notwithstanding the concession that the bill was "imperfect," the conference report was agreed to. It was pointed out that further amendment would cause substantial delay and that any evils could be corrected by subsequent legislation. *Id.* at 1282–83. The House adopted the conference report without debate on this provision. *Id.* at 1397–401.

This legislative history demonstrates that the effect of the second sentence of § 478 is to protect whatever rights and licenses with regard to the public domain existed prior to the reservation. We interpret the provision as a congressional declaration that the establishment of forest reserves would not alter the long-standing policy of allowing unimpeded access to the public land or interfere with the rights of persons then using the land, not as an affirmative grant of a broad right of entry to all persons. The express language of the statute provides that nothing *in the act* shall be construed to prohibit certain activities. The language grants no rights not already in existence. *See* Robbins, *supra,* at 323; John Ise, The United States Forest Policy 140 (1920).

The protection of "lawful" and "proper" entry upon the reserves cannot be construed to limit congressional authority to regulate such entry. No vested right to use the public domain for a particular purpose arises from the government's mere acquiescence in such use. In *Light* v. *United States,* 220 U.S. 523 (1911), the Court wrote:

> [W]ithout passing a statute, or taking any affirmative action on the subject, the United States suffered its public domain to be used for such purposes. There thus grew up a sort of implied license that these lands, thus left open, might be used so long as the Government did not cancel its tacit consent. *Buford* v. *Houtz,* 133 U.S. 326. Its failure to object, however, did not confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes.

*Id.* at 535. *See also The Yosemite Valley Case,* 82 U.S. (15 Wall.) 77 (1872); *Frisbie* v. *Whitney,* 76 U.S. (9 Wall.) 187, 194 (1869).

Section 478 clearly subjects entry upon the national forests to reasonable regulation by the Secretary. Prior to the enactment of the Federal

36

Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. §§ 1701–1782, and its repeal of § 2 of the Act of June 4, 1897, 16 U.S.C. § 551, insofar as the latter section applied to the issuance of rights-of-way through public lands, the Secretary was required to read § 478 and § 551 together. *United States* v. *Grimaud*, 220 U.S. 506, 515 (1911). Section 551 provides that the Secretary shall "make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction . . . ." This section was held to confer upon the Secretary a "broad scope of regulation" intended to "be effective." *See* 42 Op. Att'y Gen. 127, 140, *citing Chicago Mil. & St. P. Ry.* v. *United States*, 218 F. 288, 298 (9th Cir. 1914), *aff'd*, 244 U.S. 358 (1917); *Shannon* v. *United States*, 160 F. 870, 873 (9th Cir. 1908). In *Grimaud*, the Court stated that the Secretary "is required to make provisions to protect the forest reserves from depredation and harmful uses." 220 U.S. at 552. The Secretary's authority to grant rights-of-way across national forest lands now is based on 16 U.S.C. §§ 532–538, and FLPMA, 43 U.S.C. §§ 1761–1771. Both statutes authorize the Secretary to protect the forest lands.[13]

This interpretation is consistent with the 1962 opinion of the Attorney General.[14] His review of the legislative history of § 478 disclosed a legislative desire to protect explicitly only the rights of ingress and egress of actual settlers. 42 Op. Att'y Gen. 127, 138. He found that entry upon the national forests by all other persons is subject to your rules and regulations covering the forests and discussed the scope of your regulatory authority as follows:

---

[13] Section 504 of FLPMA, 43 U.S.C. § 1764, directs the Secretary to issue regulations with respect to the terms and conditions of the rights-of-way. Section 505, 43 U.S.C. § 1765, requires, *inter alia,* that each right-of-way permit contain terms and conditions which will "protect the environment," "protect Federal property," and "otherwise protect the public interest in the lands traversed by the rights-of-way or adjacent thereto." The Act of October 13, 1964, 16 U.S.C. §§ 532–538, which generally concerns the construction and maintenance of a system of roads within the national forests, authorizes the Secretary to grant permanent or temporary easements "under such regulations as he may prescribe." 16 U.S.C. § 533.

[14] In 1964, in response to the Attorney General's 1962 opinion, Congress passed legislation giving the Secretary the authority to grant permanent or temporary easements over lands managed by the Department of Agriculture. Pub. L. No. 88–657, § 2, 78 Stat. 1089 (1964). The committee reports of both the House and the Senate indicate that Congress understood the Attorney General's opinion to hold that § 478 was "not to be construed as a statutory guarantee of access to private lands within the national forests." S. Rep. No. 1174, 88th Cong., 2d Sess. 4 (1964); H.R. Rep. No. 1920, 88th Cong., 2d Sess. 4 (1964). In the Senate report, the committee stated:

> It should be expressly noted that this legislation is intended neither to affirm nor to abrogate the Attorney General's interpretation of the act of June 4, 1897 (30 Stat. 36, 16 U.S.C. 478), with respect to the act's assurance or lack of assurance concerning access to private lands across national forest lands. However, the predictable effect of this legislation will be to minimize the likelihood of litigation between the United States and private landowners designed to test applications of the Attorney General's interpretation of the act of June 4, 1897. This legislation will provide to most owners of private land a satisfactory alternative to statutory assurance of access to and from their lands. The committee therefore recommends enactment of the act as amended.

Amendments which would have created a statutory right of access were rejected both in committee (S. Rep. No. 1174, at 8) and on the Senate floor. 110 Cong. Rec. 16,413-15 (1964).

As the Supreme Court pointed out in *United States* v. *Grimaud,* 220 U.S. 506, 516-17, it is your function to determine what private use of the national forests in any given case is consistent with the purposes sought to be attained by the statute. The imposition of harsh and onerous requirements not related to the benefit received or to your general responsibility to preserve and manage the national forests, might well constitute an abuse of discretion.

42 Op. Att'y Gen. at 147.

Your department argues that it has a long-standing policy that the Secretary is without discretion to deny access under § 478, and that a change in this policy would have a drastic effect on the well-established expectations of landowners within the national forests. It is a familiar principle that interpretations made contemporaneously with the enactment of a statute and consistently followed for a long period are entitled to great weight, particularly if they have been relied on by the public. *See Zuber* v. *Allen,* 396 U.S. 168, 192-93 (1969); *Alaska S.S. Co.* v. *United States,* 290 U.S. 256, 262 (1933); *Norwegian Nitrogen Products Co.* v. *United States,* 288 U.S. 294, 315 (1933). Correspondingly, when an agency's interpretation has been neither consistent nor long-standing, the weight given it diminishes accordingly. *See Southeastern Community College* v. *Davis,* 422 U.S. 397, 411-12 (1979); *United Housing Foundation, Inc.* v. *Forman,* 421 U.S. 837, 858-59 n.25 (1975). Prior to 1962, your department relied on the first sentence of § 478 to find the same rights you now find in the second sentence. This 1962 revision of the department's interpretation occurred almost 70 years after enactment of the statute.[15]

In any case, to the extent that my judgment is governed by the customary rules of statutory construction, I am guided by the overriding rule that the statute, and not the agency's interpretation, is conclusive. *See, e.g., VolksWagenwerk* v. *Federal Maritime Commission,* 390 U.S. 261, 272 (1968). Additionally, I am persuaded by the legislative history and by the common sense rule that legislative history disclosing Congress' intent is entitled to more weight than a conflicting administrative interpretation and must control. *See Norwegian Nitrogen Products Co.* v. *United States,* 288 U.S. 294, 315 (1933); Sutherland, Statutes and Statutory Construction § 49.04 (1973 & Supp. 1975).

In sum, I conclude that § 478 does not grant access rights to private inholders other than actual settlers. In my opinion, absent a right of access otherwise granted to the landowner by Congress, you may deny requested access if such denial will protect the public interest in the

---

[15] In *Soriano* v. *United States,* 494 F.2d 681, 683 (9th Cir. 1974), the court declined to give special deference to a regulation promulgated more than 100 years after enactment of the statute.

land to be traversed. Because you may not arbitrarily deny access to private landowners, I do not foresee that this interpretation will have a drastic effect on their expectations.

## II.

Your second question is whether an inholder has an easement by necessity or other implied easement across national forest land. The conclusion in Part I (that § 478 does not grant a right of access to private property across national forest reserves, and that, absent an access right otherwise guaranteed to a landowner by Congress, § 478 allows denial of access) renders apparent the importance of this question.

In the 1962 opinion, the Attorney General stated that whether an easement by necessity lies against the government is a complex and controversial question. While he concluded that it need not be decided at that time, the Attorney General nonetheless offered his view that such an easement does not exist over public lands. 42 Op. Att'y Gen. 127, 148. It is also my view that the common law doctrine of easement by necessity does not apply to congressional disposition of the public domain. This does not mean, however, that access cannot otherwise be implied. In my opinion, access may be implied if it is necessary to effectuate the purpose for which the land was granted.

The doctrine of easement by necessity is a common law property concept that was recently described by the Supreme Court as follows: "Where a private landowner conveys to another individual a portion of his lands in a certain area and retains the rest, it is presumed at common law that the grantor has reserved an easement to pass over the granted property if such passage is necessary to reach the retained property." *Leo Sheep Co.* v. *United States,* 440 U.S. 668, 679 (1979).[16] Authoritative treatises on property law identify three basic prerequisites to the creation of an easement by necessity.[17] First, the titles to the two tracts in question at some time must have been held by one person. This is the unity-of-title requirement. Second, the unity of title must have been severed by a conveyance of one of the tracts. Third, the easement must be necessary in order for the owner of the dominant tenement to use his land. This necessity must exist both at the time of the severance of title and at the time of application for the exercise of the easement.[18]

---

[16] In *Leo Sheep,* the Court considered the question whether the United States had reserved an easement to pass over lands which had passed from federal ownership. Your inquiry, conversely, is whether the United States granted an easement to a federal land grantee to pass over retained lands to reach the conveyed property. The *Leo Sheep* case is discussed *infra* at pages 19–20, note 28.

[17] *See generally* 3 Powell on Real Property § 410 (1979); 2 Thompson on Real Property § 363, at 424–27 (1961 & Supp. 1978); 3 Tiffany, Law of Real Property § 793 (3d ed. 1939 Supp. 1979); Comment, *Easements By Way of Necessity Across Federal Lands,* 35 Wash. L. Rev. 105, 107 (1960).

[18] Courts have emphasized various factors in applying this doctrine. The Restatement of Property § 476, lists some of these factors:

Continued

*See* 3 Powell on Real Property § 410, at 34–59 to 34–60 (1979); Simonton, *Ways By Necessity,* 25 Colum. L. Rev. 571, 573–79 (1925). Whether this doctrine applies to the government has not been resolved. Courts and commentators have differed.[19]

To determine whether the doctrine applies to property of the federal government, it is necessary to determine what law controls. Here federal law must control. The Constitution vests in Congress alone authority to dispose of and make needful rules concerning the public domain. U.S. Const., Art. IV, § 3, cl. 2. As I have noted earlier in this opinion, this power is vested in Congress "without limitation." *United States* v. *Gratiot,* 39 U.S. (14 Pet.) 526, 537 (1840). *See also Kleppe* v. *New Mexico,* 426 U.S. 529, 536 (1976); *United States* v. *San Francisco,* 310 U.S. 16, 29–30 (1940). The construction of grants by the United States has been held to be a federal, not a state, question. *United States* v. *Oregon,* 295 U.S. 1, 27–28 (1935), *Packer* v. *Bird,* 137 U.S. 661, 669 (1891).[20] With regard to implying an easement across land which the United States still holds in trust for the public, therefore, federal law must control. *Utah Power & Light Co.* v. *United States,* 243 U.S. 389, 404 (1917).[21] Federal property can be made subject to state law only when congressional authorization is clear and unambiguous. *See EPA* v. *California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 211 (1976); *Kleppe* v. *New Mexico,* 426 U.S. 529, 536 (1976).

(a) whether the claimant is the conveyor or the conveyee;
(b) the terms of the conveyance;
(c) the consideration given for it;
(d) whether the claim is made against a simultaneous conveyee;
(e) the extent of the necessity;
(f) whether reciprocal benefits result to the conveyor or conveyee;
(g) the manner of use of the land before conveyance;
(h) the extent to which prior use was known.

[19] *See, e.g., United States* v. *Dunn,* 478 F.2d 443 (9th Cir. 1973) (holding, with one judge dissenting, that the doctrine is applicable); *Sun Studs, Inc.,* 83 I.D. 518 (1976) (holding that the doctrine is not applicable). Some commentators state that ways of necessity do not arise against the sovereign. 2 G. Thompson, Commentaries on the Law of Real Property § 362, at 417 (1961); Jones on Easements § 301, at 247 (1898). Others conclude that the doctrine should be applicable. 3 Powell on Real Property § 410 at 34–73 to 34–74 (1979); 3 Tiffany, Law of Real Property § 793 (3d ed. 1939).

[20] When, however, the land has passed from federal ownership, it becomes subject to the laws of the state in which it is located. *See Oregon ex rel. State Land Bd.* v. *Corvallis Sand & Gravel Co.,* 429 U.S. 363, 372 (1977). It follows, therefore, that where title to both a dominant and servient tenement has passed from federal ownership, the question whether the unity-of-title requirement is satisfied by prior government ownership is a question of state law. State courts have reached differing opinions on this question. Courts in California, Florida, Indiana, Oklahoma, Tennessee, and Texas have concluded that unity of title cannot be based on prior government ownership. *Bully Hill Copper Mining & Smelting Co.* v. *Bruson,* 4 Cal. App. 180, 87 P. 237, 238 (1906); *Guess* v. *Azar,* 57 So. 2d 443, 444 (Fla. 1952); *Continental Enterprises Inc.* v. *Cain,* 296 N.E.2d 170, 171 (Ind. 1973); *Dudley* v. *Meggs,* 153 P. 1121, 1122 (Okla. 1915); *Pearne* v. *Coal Creek Min. & Mfg. Co.,* 90 Tenn. 619, 627–28, 18 S.W. 402–04 (1891); *State* v. *Black Bros.,* 116 Tex. 615, 629–30, 297 S.W. 213, 218–19 (1927). Courts in Arkansas, Missouri and Montana have reached the opposite conclusion. *Arkansas State Highway Comm'n* v. *Marshall,* 485 S.W.2d 740, 743 (Ark. 1972); *Snyder* v. *Warford,* 11 Mo. 513, 514 (1848); *Violet* v. *Martin,* 62 Mont. 335, 205 P. 221, 223 (1922).

[21] The rules adopting state law to determine what riparian rights pass in a federal grant are not applicable to the question of ways across federal land. *Utah Power & Light Co.* v. *United States,* 243 U.S. 389, 411 (1917). *See Oregon ex rel. State Land Bd.* v. *Corvallis Sand & Gravel Co.,* 429 U.S. 363, 372 (1977); *United States* v. *Oregon,* 295 U.S. 1, 27 (1935); *Hardin* v. *Jordan,* 140 U.S. 371 (1891).

To determine what rights have passed under federal law, it is necessary to interpret the statute disposing of the land.[22] It is a recognized principle that all federal grants must be construed in favor of the government "lest they be enlarged to include more than what was expressly included." *United States* v. *Grant River Dam Authority*, 363 U.S. 229, 235 (1960); *United States* v. *Union Pac. Ry.*, 353 U.S. 112, 116 (1957).[23] In *Pearsall* v. *Great No. Ry.*, 161 U.S. 646, 664 (1895), the Court wrote: "Nothing is to be taken as conceded . . . but what is given in unmistakeable terms, or by an implication equally clear. . . ." These general rules must not be applied to defeat the intent of Congress, however. The Supreme Court has stated that public grants are "not to be construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication. . . ." *United States* v. *Denver & Rio Grande R.R.*, 150 U.S. 1, 14 (1893). In all cases, the intent of Congress must control. *Id. See also Missouri, K. & T. Ry.* v. *Kansas Pac. Ry.*, 97 U.S. 491, 497 (1878).

These rules dictate that if it is clear that Congress intended to grant access, such access must be acknowledged, its scope consistent with the purposes for which the grant was made.[24] An implied easement defined by the actual intent of Congress must be distinguished from an easement by necessity, which relies on a presumed intent of the parties. There are no clear uniform rules for determining the scope of an easement by necessity. In some cases, it has been held that the scope includes whatever access is necessary for any reasonable, beneficial use of the dominant tenement, not merely the use for which the grant was made. *See, e.g., New York Cent. R.R.* v. *Yarian*, 219 Ind. 477, 39 N.E.2d 604, 606 (1942); *Soltis* v. *Miller*, 444 Pa. 357, 283 A.2d 369, 370-71 (1971); *Meyers* v. *Dunn*, 49 Conn. 71, 78 (1881); *Whittier* v. *Winkley*, 62 N.H. 338, 339-40 (1882); Jones on Easements § 323 (1898). Since the common law doctrine is based on the presumed intent of the parties, its operation may have the effect of disregarding or possibly frustrating the intention of the grantor, absent express language in the conveyance denying an easement. 2 G. Thompson, Law of Real Property § 362 (1961), *citing Lord* v. *Sanchez*, 136 Cal. App. 2d 704 289 P.2d 41 (1955); *Moore* v. *Indiana & Michigan Elec. Co.*, 299 Ind. 309, 95 N.E.2d 210 (1950). Thus, if the doctrine were allowed to operate where the Government is the grantor, the actual intent of Congress would, at the least,

[22] We note that your department, without reaching the easement-by-necessity issue, has concluded that an examination of the granting statute is essential to determining access rights. *See* Memorandum: Access to State and Private Inholdings in National Forests at 18, U.S. Dept. of Agriculture (Oct. 31, 1979).

[23] *See also Camfield* v. *United States*, 167 U.S. 518, 524-26 (1897); *United States* v. *Clarke*, 529 F.2d 984, 986 (9th Cir. 1976).

[24] *See Curtin* v. *Benson*, 222 U.S. 78, 86 (1911). In *United States* v. *9,947.71 Acres*, 220 F. Supp. 328, 331 (D. Nev. 1963), the court recognized an implied access right for mining purposes where a mining claim owner had to cross public domain to reach his claim. *Cf. Arizona* v. *California*, 373 U.S. 546, 599-600 (1963); *Winters* v. *United States*, 207 U.S. 564, 575-77 (1908). These cases recognize an implied reservation of water rights for Indian reservations.

become irrelevant, and, in some cases, would be thwarted. Plainly, the application of the common law doctrine would be inconsistent with the established principles that the intent of Congress in disposing of federal land must control, and that rights in government land cannot be presumed to pass by implication.[25]

The doctrine of easements by necessity was developed to settle disputes between private parties, not disputes involving the federal government.[26] The federal government has at one time held title to over three-fourths of the territory of the United States; it today retains title to approximately one-third of the nation's land. One-Third of the Nation's Land: A Report to the President and to Congress by the Public Land Law Review Comm'n, at 8 (1970). It holds property as sovereign, as well as proprietor, and exercises power beyond that which is available to a private party. *Kleppe* v. *New Mexico,* 426 U.S. 529, 539 (1976); *Light* v. *United States,* 220 U.S. 523, 536–37 (1911). Throughout its history, statutes have been enacted allowing access across its land.[27] It holds land in trust for all the people and in disposing of it is concerned with the public interest. *Utah Power & Light Co.* v. *United States,* 243 U.S. 389, 409 (1917); *Causey* v. *United States,* 240 U.S. 399, 402 (1916). In *Causey,* the Court wrote that "the Government in disposing of its public lands does not assume the attitude of mere seller of real estate at its market value." *Id.*

For these reasons, other doctrines applicable to private landowners have been held inapplicable to the sovereign. In *Jourdan* v. *Barrett,* 45 U.S. (4 How.) 169, 184–85 (1846), the Supreme Court held that no prescriptive rights may be obtained against the sovereign, and in *Field* v. *Seabury,* 60 U.S. (19 How.) 323, 332–33 (1856), the Court held that government patents may not be collaterally attacked as can grants from a private party. In *United States* v. *California,* 332 U.S. 19 (1947), the

---

[25] It is noteworthy that since the Attorney General opined in 1962 that the doctrine of easements by necessity was not enforceable across federal land, Congress has not modified the rule. Although this generally is not strong evidence when there is no indication that Congress was aware of the ruling (*Zuber* v. *Allen,* 396 U.S. 168, 194 (1969)), it is more persuasive when, as here, congressional action directly resulted from the opinion. *See* n.14, *supra. See generally Bean* v. *Ledmar,* 368 U.S. 403, 412-13 (1962); *United States* v. *Midwest Oil Co.,* 236 U.S. 459, 481 (1915).

[26] The doctrine has been traced to early English origins. Simonton, *Ways of Necessity,* 25 Colum. L. Rev. 571, 572-78 (1925). It usually has been predicated on public policy favoring land utilization and a presumption of intent. 3 Powell on Real Property § 410 at 34-59 to 34-60 (1979).

[27] *See, e.g.,* Act of March 3, 1875, ch. 252, § 1, 18 Stat. 482 (repealed 1976) (right of way for railroads); Act of March 3, 1891, ch. 561, § 18 (repealed 1976) (right of way for irrigation ditches and canals); Act of Jan. 21, 1895, ch. 37, § 1 (repealed 1976) (right of way for tramrods, canals, and reservoirs); Act of July 26, 1866, ch. 262, § 8, 14 Stat. 253 (repealed 1976) (right of way for highways). These statutes were repealed by the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, §§ 501-511, 90 Stat. 2776-82 (codified at 43 U.S.C. §§ 1761-1771). FLPMA provides, with certain exceptions, that rights of way across government land can only be obtained as provided in that Act. 43 U.S.C 1770. General and comprehensive legislation, prescribing a course of conduct to be pursued and the parties and things affected, and specifically describing limitations and exceptions, is indicative of a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter. *Isbrandtsen Co.* v. *Johnson,* 343 U.S. 779, 787-88 (1952); *Sneel* v. *Ruppert,* 541 P.2d 1042 (Wyo. 1978); J. Sutherland, Statutes and Statutory Construction § 50.05 (1973 & Supp. 1978).

Court refused to hold that the federal government had forfeited by laches or estoppel its interest in littoral property, stating: "The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property. . . ." *Id.* at 40.

These same reasons lead me to conclude, as did the Court in *Leo Sheep,* that the doctrine of easements by necessity as applicable to federal lands is "somewhat strained, and ultimately of little significance" and that the "pertinent inquiry . . . is the intent of Congress." [28] A grantee is entitled instead to reasonable access across government land to use his property for the purposes for which the land grant was made, if such an access right either expressly or impliedly arises from the act authorizing the land grant. [29]

To interpret correctly congressional intent underlying a statutory land grant, it is necessary to look at the condition of the country when the grant was made, as well as the declared purpose of the grant. *Leo Sheep Co.* v. *United States,* 440 U.S. 668, 682 (1979); *Winona & St. Paul R.R.* v. *Barney,* 113 U.S. 618, 625 (1885); *Platt* v. *Union Pacif. R.R.,* 99 U.S. 48, 64 (1878). In *Superior Oil Co.* v. *United States,* 353 F.2d 34 (9th Cir. 1965), for example, the court looked to the purpose of the grant and concluded that the scope of the implied access was not broad enough to include the type of entry sought. The plaintiff oil company was a lessee of a religious mission which had received a land patent to facilitate and encourage its activities among the Indians. The land in question was surrounded by the Hopi Reservation, which the United States held in trust for the Indians. The issue on appeal was whether

---

[28] In *Leo Sheep Co.* v. *United States,* 440 U.S. 668 (1979), the Court, in holding that the federal government does not have a reserved easement by necessity across the land of its grantee or its grantee's successor, wrote:

> First of all, whatever right of passage a private landowner might have, it is not at all clear that it would include the right to construct a road for public access to a recreational area. More importantly, the easement is not actually a matter of necessity in this case because the Government has the power of eminent domain. Jurisdictions have generally seen eminent domain and easements by necessity as alternative ways to effect the same results. . . . [S]tate courts have held that the "easement by necessity" doctrine is not available to the sovereign.

*Id.* at 679-81 (footnotes omitted). Of course, the opinion in *Leo Sheep* is not alone dispositive of the question you have asked. It involved a claim by the government grantor, not the private grantee, of an easement by necessity. The Court there did rely substantially on the power of eminent domain, and was careful not to decide the broader question of the availability of the easement-by-necessity doctrine generally. In an earlier case refusing to find a reserved way of necessity for a public easement across private land, a district court stated more broadly: "It is, in my judgment, very doubtful whether the doctrine of ways of necessity has any application to grants from the general Government under the public land laws." *United States* v. *Rindge,* 208 F. 611, 618 (S.D. Cal. 1913). *See also, Sun Studs Inc.,* 83 I.D. 518 (1976). *But see, Bydlon* v. *United States,* 175 F. Supp. 891 (Ct. Cl. 1959); *Mackie* v. *United States,* 195 F. Supp. 306 (D. Minn. 1961).

[29] Of course, even without such an entitlement, a landowner may apply for an easement permit under procedures established pursuant to other statutes. *See* FLPMA, 43 U.S.C 1761-1771; Act of October 13, 1964, 16 U.S.C. 532 *et seq.* It cannot be assumed that Congress, or federal regulatory authorities, will execute their power in such a way as to bring about injustice. *See United States* v. *California,* 332 U.S. 19, 40 (1947).

the oil company was entitled to move heavy equipment across the reservation to drill for oil on the leased property. In ruling that access was limited to the scope of the grant, the court stated:

> Certainly it cannot be said either that public policy demands or that the Indians' trustee impliedly intended a grant of a way of access across Indian lands greater in scope than was required for mission purposes and whose greater scope was necessary only in order to permit the granted lands to be used in a fashion adverse to the interests of the Indians.[30]

Although some courts that have dealt with this issue have written in terms of easements by necessity, most of them in effect have looked at the grant in question and limited access according to the purpose of the grant. The *Superior Oil* case was relied on by the Tenth Circuit in *Kinscherff* v. *United States,* 586 F.2d 159 (10th Cir. 1978), which held:

> An easement by necessity *for some purposes* could possibly have arisen when the United States granted the patent to plaintiffs' predecessor in interest. . . . While nothing ordinarily passes by implication in a patent, *Walton* v. *United States,* 415 F.2d 121 (10th Cir.), an implied easement may arise *within the scope of the patent.*

*Id.* at 161 (emphasis added).

Similar statements appear in *Utah* v. *Andrus,* (unreported) C 79–0037 (D. Utah Oct. 1, 1979), in which Utah claimed an easement by necessity for access to its school grant lands. Relying on *United States* v. *Dunn,* 478 F.2d 443, 444 n.2 (9th Cir. 1973), the district court concluded: "Although this common law presumption might not ordinarily apply in the context of a Federal land grant, the liberal rules of construction applied to school trust land allowed for the consideration of this common law principle and justify its application here."[31] The

---

[30] The court, in effect, created a hybrid doctrine, applying principles of both ways of necessity and ways created by the actual intent of the grantor:

> Appellant's position is simply that since the patent for the Mission was in unrestricted fee simple it carried with it by implication a way of necessity over lands of the United States for all purposes to which the conveyed land might lawfully be put.

> Such is not the law. The scope and extent of the right of access depends not upon the state of title of the dominant estate, nor the existence or lack of limitations in the grant of that estate, but upon what must, under the circumstances, be attributed to the grantor either by implication of intent or by operation of law founded in a public policy favoring land utilization.

*Superior Oil Co.* v. *United States.* 353 F.2d 34, 36–37 (9th Cir. 1965).

[31] Slip Op. at 8. In *United States* v. *Dunn,* 478 F.2d 443 (9th Cir. 1973), the United States sought an injunction to prevent Dunn, who held title as a grantee of a railroad, from constructing an access road for commercial and residential development of his land. The district court granted partial summary judgment, holding defendants trespassers and the government entitled to immediate possession. The Ninth Circuit reversed, holding that summary judgment was precluded because defendants raised the factual issue whether they had an easement by necessity. *Id.* at 446. The *Dunn* court's only discussion of the application of the doctrine, however, appeared in a footnote response to the dissenting judge. In the dissent, Judge Wright stated simply that he "would hold that under the facts of this case the

Continued

44

court went on to hold that this right is not absolute, however. It reasoned:

> Under the Constitution Congress has the authority and responsibility to manage Federal land. U.S. Const. art. IV, § 3, cl. 2. . . . There is nothing in the school land grant program that would indicate that when Congress developed the school land grant scheme it intended to abrogate its right to control activity on Federal land. Further, it is consistent with common law property principles to find that the United States, as the holder of the servient tenement, has the right to limit the location and use of Utah's easement of access to that which is necessary for the state's reasonable enjoyment of its right. . . . Thus, the court holds that, although the State of Utah or its lessee must be allowed access to section 36, the United States may regulate the manner of access under statutes such as FLPMA.

Slip Op. at 21.

Cases like *Superior Oil, Kinscherff,* and *Utah* v. *Andrus* lend support to my conclusions with respect to implied rights to access across federal land. While the common law easement by necessity does not run against the United States, a right to access may nonetheless be implied by reference to particular grants. And, to the extent that such implied rights exist, your broad authority—delegated to you by Congress—to manage forest reserves empowers you to regulate their exercise. *See United States* v. *Perko,* 108 F. Supp. 315, 322-23 (D. Minn. 1952), *aff'd,* 204 F.2d 446 (8th Cir.), *cert. denied,* 346 U.S. 832 (1953); *Perko* v. *Northwest Paper Co.,* 133 F. Supp. 560, 569 (D. Minn. 1955).

Determining what implied rights exist in the numerous federal land grants is beyond the scope of this opinion. As set forth above, this determination depends on when the grant was made and for what purpose. Mindful of the goal of giving effect to legislative intent, you must look to the rules the Supreme Court has adopted for interpretation of federal land grants. As discussed previously, land grants generally are to be strictly construed. This rule must be balanced against the conflicting rule that in some situations, certain types of land grants may deserve a more liberal construction because of the circumstances surrounding passage of the statutes in question. *See generally Leo Sheep Co.* v. *United States,* 440 U.S. 668, 682-83 (1979) (railroad land grants);

doctrine of easement by necessity is not binding on the United States. . . ." *Id.* at 446. The majority responded:

> Since the Government did not, in our judgment, raise the point upon which Judge Wright bases his dissent, we have not discussed it in the opinion, but nevertheless did give it consideration and concluded that it lacked merit.

*Id.* at 444 n.2. I do not find this case persuasive authority for application of the doctrine.

*Wyoming* v. *United States,* 255 U.S. 489, 508 (1921) (state school land grants). Absent express language to the contrary, however, a grant should not be construed to include broad rights to use retained government property, particularly in the case of gratuitous grants. *See United States* v. *Union Pac. R.R.,* 353 U.S. 112 (1957); *Camfield* v. *United States,* 167 U.S. 518 (1897); *Wisconsin Central R.R.* v. *United States,* 164 U.S. 190 (1896); 30 Op. Att'y Gen. 263, 264 (1941).

Once the right, if any, is found to exist, you should consider how that right reasonably should be regulated to protect the public's interest in federal property. It is beyond dispute that such rights are subject to reasonable regulation without a resulting inverse condemnation. *See generally Johnson* v. *United States,* 479 F.2d 1383 (Ct. Cl. 1973) (restriction of access by erection of fence enclosing extended portion of highway held not a taking); 2 Nichols on Eminent Domain § 5.72[1] (1978). Nonetheless, fewer restrictions properly may be imposed on well established, developed uses than on unexercised rights. *See Penn Central Transp. Corp.* v. *City of New York,* 438 U.S. 104 (1978); *Euclid* v. *Amber Realty Co.,* 272 U.S. 365 (1926). Frustration and appropriation are essentially different things. *United States* v. *Grand River Dam Authority,* 363 U.S. 229, 236 (1960), *citing Omnia Co.* v. *United States,* 261, 502, 513 (1923).

## III.

Your third question is whether any act of Congress has modified any implied rights that may accompany federal grants. Of particular concern are the Wilderness Act, 16 U.S.C. §§ 1131-1136, and various wilderness study acts.[32] *See, e.g.,* Montana Wilderness Study Act of 1977, Pub. L. No. 95-150, 91 Stat. 1243; Sheep Mtn. and Snow Mtn. Wilderness Areas, *et al.,* Pub. L. No. 94-557, § 3, 90 Stat. 2635 (1976). These wilderness study acts require you to exercise your discretion so as to preserve the wilderness character of the land.[33] If a request for a particular mode of access would destroy that wilderness character, therefore, you must deny the request. These acts also provide, however, that their mandates are subject to "existing private rights." [34] *See, e.g.,* Montana Wilderness Study Act, § 3(a), 16 U.S.C. § 1132 note. You must determine, therefore, what implied access rights are guaranteed in a particular grant, and allow the exercise of those rights. The wilder-

---

[32] The impact of the Wilderness Act is discussed in Part IV.

[33] *See Parker* v. *United States,* 448 F.2d 793 (10th Cir. 1971), *cert. denied sub. nom., Kaibab Industries* v. *Parker,* 405 U.S. 989 (1972) (held Secretary's discretion to enter into the timber harvesting contract for public land is limited by 16 U.S.C. § 1132(b)).

[34] In addition to "existing private rights," the Wilderness Act permits ingress to and egress from mining locations until December 31, 1983. 16 U.S.C. § 1133(d)(3). Such ingress and egress is subject to reasonable regulation by the Secretary of Agriculture, consistent with use of the land for mineral exploration, location, development, production, and related purposes.

ness study acts thus do not modify any implied rights that may accompany federal grants.

Nor do I find that the other statutes you cite modify such implied rights. The Organic Act of 1897, 16 U.S.C. § 478, discussed at length in Part I of this opinion, preserves access rights existing at the time of creation of a forest reserve. The Act of October 13, 1964, 16 U.S.C. 532–538, which authorizes the Secretary of Agriculture to grant easements for road rights-of-way over lands administered by the Forest Service,[35] was passed in reaction to Attorney General Kennedy's 1962 interpretation of 16 U.S.C. § 478, which, as discussed earlier, allowed the imposition of a reciprocity requirement with respect to rights-of-way. By empowering the Secretary of Agriculture to grant permanent easements, the Congress hoped to provide an alternative to statutory assurance of access to and from private inholdings.[36] Thus, the statute does not substantively modify implied rights of access. It does, along with FLPMA, allow the imposition of certain procedural requirements. such as application for a permit prior to road construction. We have found no other statute that substantively modifies implied access rights.

## IV.

Your final question concerns § 5(a) of the Wilderness Act, 16 U.S.C. 1134(a). Your department has concluded that this provision guarantees a private owner "adequate access" to an inholding unless the landowner voluntarily chooses a land exchange. Pursuant to this interpretation, regulations have been promulgated providing that access "shall be given." [37] The Department of the Interior has taken the position that § 5(a) grants the Secretary of the Interior (and, by analogy, the Secretary of Agriculture) the authority to deny access to a landowner, and

---

[35] 16 U.S.C. § 533. *See* p. 10 & note 13 *supra*. This statute was not repealed by FLPMA. With respect to the Secretary of Agriculture's authority under §§ 532–538, FLPMA provided:

> [N]othing in this subchapter shall be construed as affecting or modifying the provisions of sections 532 to 538 of title 16 and in the event of conflict with, or inconsistency between, this subchapter and sections 532 to 538 of title 16, the latter shall prevail: *Provided further,* That nothing in this Act should be construed as making it mandatory, that, with respect to forest roads, the Secretary of Agriculture limit rights-of-way grants or their terms of years or require disclosure pursuant to section 1761(b) of this title or impose any other condition contemplated by this Act that is contrary to present practices of that Secretary under sections 532 to 538 of title 16.

43 U.S.C. § 1770(a).

[36] S. Rep. No. 1174, 88th Cong., 2d Sess. 4 (1964). *See* note 10 *supra*.

[37] 36 C.F.R. § 293.12. This regulation provides in part:

> States or persons, and their successors in interest, who own land completely surrounded by National Forest Wilderness shall be given such rights as may be necessary to assure adequate access to the land. "Adequate access" is defined as the combination of routes and modes of travel which will, as determined by the Forest Service, cause the least lasting impact on the primitive character of the land and at the same time will serve the reasonable purposes for which the State and private land is held or used.

This regulation is consistent with your department's interpretation of 16 U.S.C. § 478. *See* 36 C.F.R. § 212.8(b).

offer land exchange as indemnity.[38] The Interior Department's interpretation, contrary to yours, under appropriate circumstances would allow denial of "adequate access" to private holdings as well as to state-owned inholdings.

Some initial observations about the Wilderness Act are in order. The purpose of the Wilderness Act is to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). "Wilderness" is defined as an area of "undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c). Section 4(c) of the Act prohibits, with limited exceptions, use of motor vehicles or other mechanical transportation. 16 U.S.C. § 1133(c). It also prohibits permanent roads within any wilderness area, except as specifically provided in the Act, and subject to "existing private rights." *Id.* The Act directs you to administer wilderness areas within your jurisdiction so as to preserve their wilderness character. 16 U.S.C. § 1133(b). The phrase "existing private rights" in § 4(c), 16 U.S.C. § 1133(c), is not defined in the Act or in its legislative history, but, in my opinion, includes existing easements, which are well-recognized rights in property.[39] Thus, in spite of the Act's general prohibitions, if a private inholder has an implied right to a particular type of access, that right is preserved.

The Wilderness Act was developed over a 15-year period, with almost unprecedented citizen participation. *See* S. Rep. No. 109, 88th Cong., 1st Sess. 7 (1963). The first major wilderness bill was introduced in the 85th Congress. S. 1176, 85th Cong., 1st Sess. (1957). In 1961, the Senate passed a wilderness bill, S. 174, but the House failed to pass it.

---

[38] Supplemental Memorandum In Support of Plaintiff's Motion for Permanent Injunction, at 14–19, *United States* v. *Cotter Corp.*, No. C 79-0307 (D. Utah Oct. 1, 1979). The current regulation of the Interior Department's Fish and Wildlife Service, 50 C.F.R. 35.13, although somewhat ambiguous, restricts access to means and routes which will "preserve the wilderness character of the area." The regulation provides:

> Rights of States or persons and their successors in interest, whose land is surrounded by a wilderness unit, will be recognized to assure adequate access to that land. Adequate access is defined as the combination of modes and routes of travel which will best preserve the wilderness character of the landscape. Modes of travel designated shall be reasonable and consistent with accepted, conventional, contemporary modes of travel in said vicinity. Use will be consistent with reasonable purposes for which such land is held. The Director will issue such permits as are necessary for access, designating the means and routes of travel for ingress and degress (*sic*) so as to preserve the wilderness character of the area.

[39] *See, e.g., United States* v. *Welch,* 217 U.S. 333, 339 (1910); *Myers* v. *United States,* 378 F.2d 696, 703 (Ct. Cl. 1967). It logically could be argued that the phrase "existing private rights" includes and preserves only those rights which had been exercised at the time the Wilderness Act was passed. Little support exists, however, for this argument that Congress intended to extinguish unexercised access rights, leaving the landowner with only the right to access or exchange under § 5(a). When providing for preservation only of established uses, Congress clearly so indicated. *See* 16 U.S.C. § 1133(d)(1) (permitting established uses of aircraft and motorboats). In S. Rep. No. 109, 88th Cong., 1st Sess. 2 (1963), the committee stated that under the Wilderness Preservation System, "existing private rights *and* established uses" are permitted to continue. (Emphasis added.) A way of access to which a person is entitled by express or implied grant predating the Wilderness Act is a right which existed prior to the effective date of the Act, whether exercised or unexercised.

48

In 1963, S. 4 was introduced in the 86th Congress. It was identical to S. 174, with one exception not relevant here. It passed the Senate by a large margin (110 Cong. Rec. 17,458 (1964)), but was amended in the House (110 Cong. Rec. 17,461 (1964)). A conference committee was convened and adopted with few amendments the House version of the bill, H.R. 9070. *See* H.R. Rep. No. 1829, 88th Cong., 2d Sess. (1964). The conference bill was approved by both Houses (110 Cong. Rec. 20,603, 20,632 (1964)) and signed by the President on September 3, 1964.

Section 5(a) of the Act deals with state and private property completely surrounded by wilderness areas. It provides:

> In any case where State-owned or privately owned land is completely surrounded by national forest lands within areas designated by this chapter as wilderness, such State or private owner shall be given such rights as may be necessary to assure adequate access to such State-owned or privately owned land by such State or private owner and their successors in interest, or the State-owned land or privately owned land shall be exchanged for federally owned land in the same State of approximately equal value under authorities available to the Secretary of Agriculture: Provided, however, that the United States shall not transfer to a State or private owner any mineral interests unless the State or private owner relinquishes or causes to be relinquished to the United States the mineral interest in the surrounded land.

Since the enactment of the Wilderness Act, your department has interpreted this language to preserve the statutory right of access you found in 16 U.S.C. § 478.[40] Because, in my opinion, § 478 does not grant a right of access to inholders other than actual settlers, the question presented here is whether § 5(a) grants to inholders a broad right of "adequate access" beyond any existing private rights. I believe it does not.

The term "adequate access" is not defined in the Act, but the legislative history makes clear that the term includes access not consistent with wilderness uses.[41] For example, in both the Senate and House

---

[40] *See* note 37 *supra.*

[41] Other sections apply to uses consistent with wilderness preservation. In § 5(b), 16 U.S.C. § 1134(b), Congress provided that where valid mining claims or other valid occupancies are surrounded by a national forest wilderness area, the Secretary of Agriculture shall, by reasonable regulations consistent with the preservation of the area as wilderness, permit ingress to and egress from such surrounded areas by means which have been or are being customarily enjoyed with respect to similarly situated areas. *Cf.* 16 U.S.C. § 1133(d) (provides for regulation of ingress and egress consistent with use of land for mineral exploration and development). Section 5(b) did not appear in either S. 174 or S. 4. It did appear in several early House versions of the bill, and these versions expressly included "privately owned lands" in addition to valid mining claims and other valid

Continued

49

debates, repeated references were made to road construction for motorized vehicles. *See, e.g.,* 107 Cong. Rec. 18,105 (1961); 109 Cong. Rec. 5,925–26 (1963). Accordingly, your regulation defining "adequate access" does not limit access to established uses or to means consistent with wilderness uses. It includes access which "will serve the reasonable purposes for which the state and private land is held or used."[42] What constitutes adequate access will depend on the facts and circumstances of each case, and is a determination left to your discretion.

The Act requires that the state or private inholder be given such rights as are necessary to assure adequate access, or that the land be exchanged for federally owned land of approximately equal value. The language of § 5(a) indicates that a landowner has a right to access *or* exchange. If he is offered either, he has been accorded all the rights granted by the statute. If you offer land exchange, the landowner has no right of access under § 5(a). This interpretation is supported by the legislative history of the section.[43]

The language of § 5(a) first appeared in an amendment to S. 174, 87th Cong., 1st Sess. (1961). Senator Bennett of Utah proposed the amendment in response to concerns of the Western Association of State Land Commissioners, and, accordingly, the amendment pertained only to state-owned land. 107 Cong. Rec. 18,092 (1961).[44] The Senator identified a series of "loopholes" in the bill. He described the 13th loophole as follows: "No provision is made in S. 174 to preserve the right of

occupancies. This reference to privately owned lands was deleted in later versions of the bill, such as H.R. 9070. The reports do not explain this deletion. It may have occurred because of the decision during the same session to include privately owned land in § 5(a).

The final paragraph of § 5, 16 U.S.C. § 1134(c), authorizes you to acquire state or privately owned land only if either the owner concurs or Congress specifically authorizes the acquisition.

[42] *See* 36 C.F.R. § 293.12, note 27 *supra.*

[43] Your department relies on the legislative history of subsequent legislation to support its contention that § 5(a) grants a right to adequate access to inholders. In a report filed in conjunction with the Indian Peaks Wilderness Area, *et al.,* 16 U.S.C. § 1132 note, the House Committee noted that § 5 of the Wilderness Act requires the Secretary to give private landowners adequate access. H.R. Rep. No. 1460, 95th Cong., 2d Sess. 9–10 (1978). The report does not discuss the exchange option.

This legislative observation is not a part of the legislative history of the Wilderness Act. It is the intent of the Congress that enacted a law that controls interpretation of that law. *United Airlines, Inc.* v. *McMann,* 434 U.S. 192, 200 n.7 (1977); *Teamsters* v. *United States,* 431 U.S. 324, 354 n.39 (1977). Whatever evidence is provided by the report on the subsequent legislation is overcome by conflicting evidence. *See Southeastern Community College* v. *Davis,* 442 U.S. 397, 411–12 (1979); *Oscar Mayer & Co.* v. *Evans,* 441 U.S. 750, 758 (1979).

[44] The resolution passed by the Western State Land Commissioners suggested that the bill be amended to contain the following provision:

Whenever an area including State-owned land is incorporated in the wilderness system, provision shall be made for access to such land adequate for the reasonable exercise of its rights therein by the State and those claiming under it . . . . Provided, however, that, if the recommendation by which an area including State-owned land is incorporated in the wilderness system shall fail to provide for access to the State-owned land therein, then the owning State may, at its election, use the included State land as base in making indemnity selection of lands, including the mineral rights therein as provided in applicable U.S. statutes.

107 Cong. Rec. 18,103 (1961). The resolution illustrates that the Commissioners also believed access could be denied. The indemnity statutes to which the resolution refers, 43 U.S.C. 851, 852, allow states to make indemnity selections whenever school sections are lost because of other reservations or grants of the land.

access to State school sections or other lands. This should certainly be done or alternatively, the States should be permitted to choose Federal lands in another location in lieu of the land isolated within wilderness areas." *Id.* The choice referred to by Senator Bennett was the choice of lands if access were denied, not the choice of either access or exchange. He stated that the purpose of his amendment was to "give the States access to State lands within wilderness areas established under the bill, or indemnify the States for loss of such access." 107 Cong. Rec. 18,103 (1961). He did not indicate that a state could choose between access and indemnity. His amendment provided in part:

> In any case where State-owned land is completely sur-
> rounded by lands incorporated into the wilderness system
> such State shall be given (1) such rights as may be neces-
> sary to assure adequate access to such State-owned land
> by such State and its successors in interest, or (2) land in
> the same State, not exceeding the value of the surrounded
> land, in exchange for the surrounded land. Exchanges of
> land under the provisions of this subsection shall be ac-
> complished in the manner provided for the exchange of
> lands in national forests.

107 Cong. Rec. 18,103 (1961). In urging support of his amendment, Senator Bennett explained:[45]

> [T]he Western Association of State Land Commissioners
> unanimously adopted a resolution calling for indemnifica-
> tion to the States *which will lose access* to State lands in
> wilderness areas established under S. 174. Where State
> school sections or other State lands are isolated by wilder-
> ness areas, the State should be given an opportunity, *if
> access is denied,* to make in lieu selections of Federal lands
> in other areas.

*Id.* (emphasis added).[46] These statements demonstrate that Senator Bennett believed that access not consistent with wilderness preservation could be denied, and wanted to give states an alternative in such circumstances.

The Senator later explained that his amendment was designed to correct problems states had experienced with land exchanges in the past. 107 Cong. Rec. 18,105 (1961). He wanted to ensure that if the state land was "locked up," the state clearly would be entitled to an exchange. He further explained:

---

[45] Authority to exchange land is provided by 16 U.S.C. §§ 485, 486 (originally enacted as Act of Mar. 20, 1922, ch. 105, 42 Stat. 465) and 16 U.S.C. § 516 (originally enacted as Act of Mar. 3, 1925, ch. 473, 43 Stat. 1215).

[46] His belief that access to state-owned lands may be denied entirely may result in part from the language of § 4(c), 16 U.S.C. § 1133(c), which specifically protected only existing *private* rights. He made no statements relying on this language, however.

> *The first choice, providing that the State shall have adequate access, would in fact defeat the value of the wilderness bill,* assuming there were a very valuable mineral in a State school section, and the State were to decide that it was worth money to drive a road through the wilderness to get to it. This would change the situation with respect to existing law, because we would be imposing particular restrictions, in spirit at least, with respect to access to the land.

*Id.* (emphasis added).

Because of misunderstandings regarding the effect of the proposed amendment on mineral lands, Senator Bennett withdrew the amendment to allow time to confer with other Senators from western states. He re-offered the amendment the following day, with minor changes not relevant here. 107 Cong. Rec. 18,384 (1961). Senator Church, who earlier had expressed reservations about the amendment, now voiced his support. In his brief remarks, he stated:

> I think the amendment is fair to the States involved. If they need rights of access, they should have them; if they want to relinquish the land, they ought to have the right to acquire other land of comparable value.

*Id.* Although we can infer from these remarks an understanding that the section gives states the option of choosing access or exchange, the statement does admit of other interpretations. In light of the evidence to the contrary, the resolution of this question cannot be rested on the remarks of one senator during debate on the Senate floor, where "the choice of words . . . is not always accurate or exact." *In re Carlson,* 292 F. Supp. 778, 783 (C.D. Cal. 1968), *citing United States* v. *Internat'l Union UAW–CIO,* 352 U.S. 567, 585–86 (1957). If the Congress had intended to grant landowners a right to adequate access, it could have done so expressly. Resolving the doubt in favor of the grantee of such a right would violate the well-established rule that any doubts as to congressional grants of property interests must be resolved in favor of the government. *Andrus* v. *Charleston Stone Prod. Co.,* 436 U.S. 604, 617 (1978); *United States* v. *Union Pac. R.R.,* 353 U.S. 112, 116 (1957).

The Senate agreed to Senator Bennett's amendment to S. 174, but S. 174 did not pass the House during the 87th Congress. A House version of the bill did include a similar provision, also applicable only to state-owned land. The House report on this bill indicated that the section required only that a state be given either access or exchange; it did not indicate that the state could choose between them, or that adequate access otherwise was guaranteed. It stated:

> If surrounded land is owned by a State, the State would be given *either* right of access or opportunity of exchange.

. . . Ingress and egress would be provided for all valid occupancies.

H.R. Rep. No. 2521, 87th Cong., 2d Sess. 108 (1962) (emphasis added).

Variations of Senator Bennett's amendment appeared in both the Senate and House versions of the wilderness legislation in the 88th Congress. S. 4, 88th Cong., 1st Sess. § 3(j) (1963); H.R. 9070, 88th Cong., 2d Sess. § 6(a) (1964). The Senate committee report on S. 4 indicates that the understanding that states could be denied access and offered a land exchange as indemnity remained unchanged:

> Section 3(j) provides that where State inholdings exist in wilderness areas, the State shall be afforded access, or shall be given Federal lands in exchange of equal value.
>
> The amendment is an attempt to clarify the intention of the Senate in regard to section 3(j), which was originally proposed, withdrawn, revised, again proposed and adopted during floor consideration of S. 174 in 1962 [sic]. The amended section represents a more deliberate and careful drafting and consideration.

S. Rep. No. 109, 88th Cong., 1st Sess. 10, 21 (1963).

The House modified this section to include "privately owned land" in the first paragraph regarding "adequate access," rather than in the second paragraph regarding "ingress and egress." This modification is not explained in the House report. *See* H.R. Rep. No. 1538, 88th Cong., 2d Sess. 13 (1963). The change was discussed in both the Senate and House hearings, however. The sentiment expressed was that private owners should have the same rights as the States. *National Wilderness Preservation Act: Hearings on H.R. 9070, H.R. 9162, S. 4 and Related Bills, Before the Subcomm. on Public Lands of the House Comm. on Interior and Insular Affairs,* 88th Cong., 2d Sess. 1369–72 (1963). Both public witnesses and congressmen stated that ingress and egress was uncertain under both 16 U.S.C. § 478 and the wilderness acts, and that the same provision for exchange should be made for private owners as was made for States. *Id.* There is no indication that this addition of privately owned lands modified the purpose of the section as identified by Senator Bennett.

In sum, if uses are well-established prior to wilderness designation, they may be permitted to continue.[47] In addition, all existing private

---

[47] Section 4(d)(1) of the Act, 16 U.S.C. § 1133(d)(1), provides that the "use of aircraft or motorboats, where these uses have already become established, may be permitted to continue subject to such restrictions as the Secretary of Agriculture deems desirable." The committee reports reveal an intent that other well-established uses also be permitted to continue. *See. e.g.,* S. Rep. No. 109, 88th Cong., 1st Sess. 2, 10 (1963). *See also* 109 Cong. Rec. 5926 (1963) (Senator Church, a sponsor of the bill, expressed the view that owners of ranches be allowed to continue "the customary usage of their property for ingress and egress according to the customary ways").

rights of access are preserved. Even if the landowner has no prior existing right to access not consistent with wilderness uses, the Wilderness Act requires that "adequate access" be given or that an offer be made to the landowner to exchange the land for federal land of approximately equal value. As a result of § 5(a), therefore, the inholder actually may possess more access "rights" than were possessed prior to wilderness designation. If the landowner rejects an offer of land exchange, he may retain title to the inholding and exercise access rights consistent with wilderness uses, or he may consent to acquisition of his land by the federal government.

These responses to the questions you have asked should provide satisfactory guidance in your performance of your federal land management responsibilities.

Sincerely,
Benjamin R. Civiletti